UNITED STATES of America

v.

**Patrick MIRE, and Andre Camel a/k/a Andre Campbell, Defendants.**

**No. 93–CR–131C.**

United States District Court, W.D. New York.

May 3, 1994.

Patrick H. NeMoyer, U.S. Atty. (Thomas S. Duszkiewicz, Asst. U.S. Atty., of counsel), Buffalo, NY, for U.S.

Jonathan W. Feldman, Federal Public Defender (Joseph B. Mistrett, Asst. Federal Public Defender, of counsel), Buffalo, NY, for defendant Mire.

John J. Molloy, Buffalo, NY, for defendant Camel.

CURTIN, District Judge.

Defendants Patrick Mire and Andre Camel were indicted on April 27, 1993, in a two-count indictment alleging conspiracy to distribute cocaine and unlawful possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846, and 18 U.S.C. § 2. By order dated May 7, 1993, I referred all pretrial matters to the Hon. Leslie G. Foschio, United States Magistrate Judge, pursuant to 28 U.S.C. §§ 636(b)(1)(A) and 636(b)(1)(B). On January 5, 1994, following a two-day evidentiary hearing held on July 1, 1993 and July 15, 1993, the Magistrate Judge filed a report recommending denial of defendants' motions to suppress physical evidence and statements obtained as a result of their encounter with law enforcement agents at the Buffalo Niagara Frontier Transportation Authority ("NFTA") bus terminal on April 16, 1993. Both defendants have made objection to the Magistrate Judge's recommendations.[1] For the reasons given below, I reject the recommendations and grant defendants' motions.[2]

### FACTS

The Magistrate Judge made detailed findings of fact. Item 22, pp. 3–9. These findings are set forth below, more or less *verbatim* (with references to the record omitted). I have reviewed them carefully and accept them, with certain additions and exceptions as noted in the discussion that follows.[3]

On April 16, 1993, at approximately 6:50 a.m., Drug Enforcement Administration ("DEA") Special Agent Bruce Johnson and Niagara County Sheriff's Deputy Randy Fry were on duty at the Buffalo NFTA bus terminal. A Greyhound bus from New York City arrived at the terminal at approximately 6:50 a.m. Agent Johnson and Deputy Fry observed two male individuals, later identified as defendants Mire and Camel, disembark from the bus.

Agent Johnson observed that Mire was carrying a small black and white shoulder-type bag, while Camel was carrying a small brown overnight suitcase. Neither Mire nor Camel retrieved any luggage from under the Greyhound bus on which they had been riding. After Mire and Camel exited the bus, they stood outside the terminal talking for approximately two to three minutes, and then walked into the terminal and separated, an action which attracted the attention of Agent Johnson.

Upon entering the terminal, Mire began to walk in a southerly direction through the building along a glass wall which separated the interior of the terminal from the loading area for the buses. Camel walked through to the center of the terminal, and then began walking in the same direction as Mire. Deputy Fry and Officer Fred Jones, a uniformed NFTA police officer, were standing in the terminal. As Camel approached Deputy Fry

1. Defendant Mire has filed written objections. Item 24. Defendant Camel's counsel made it known to the court that he was making objections at the time of oral argument on March 25, 1994.

2. In his report, the Magistrate Judge recommended that it be found that at the time of his arrest Camel was 23 years old, and that accordingly he should not be considered a juvenile offender pursuant to 18 U.S.C. § 5031. Item 22, pp. 17–20. Camel has made no objection to this aspect of the report, and I accept the Magistrate Judge's recommendation in this regard.

3. In his objections to the report, Mire contends that the Magistrate Judge failed to address what he describes as conflicting testimony given at the suppression hearing by the two government law enforcement agents who testified. Because I find that defendants' motions can be decided in their favor without regard to the question of the apparent discrepancies in the agents' testimony, I do not reach this issue. Nevertheless, I note that the agents made no contemporaneous notes on their encounter with Mire and Camel. Had they done so, there might, perhaps, have been fewer such inconsistencies, and fair and accurate fact-finding would have been a simpler matter.

and Officer Jones, he looked right at them, and then came to a complete stop and immediately did an "about face," *i.e.* he made a hundred and eighty degree turn and retraced his steps, walking completely around the concession area. After cutting through an area where there were banks of pay telephones, Camel went over and sat down one seat away from Mire, who had taken a seat in the area of Gate 8, waiting to board a bus to Cleveland, Ohio. Both Mire and Camel then repeatedly turned around and looked back at Deputy Fry and Officer Jones.

At 7:00 a.m. another bus, which was continuing on to Cleveland, arrived at the terminal. Some type of disturbance had broken out during the trip, and the altercation continued as the bus unloaded. At that point Officer Jones, Officer Jarvis, another uniformed NFTA officer, and Agent Johnson went outside to the loading area to render any necessary assistance. While Agent Johnson was outside, Deputy Fry and Detective Paul Terranova of the Erie County Sheriff's Department, who was also stationed at the NFTA terminal with the DEA, continued surveillance of Mire and Camel for a five or ten minute period. Deputy Fry observed Camel make a telephone call from a pay telephone, and then return to his seat. After the bus disturbance was quelled, Agent Johnson reentered the terminal, and approached Deputy Fry, informing him that he intended to speak·with Mire and Camel.

Agent Johnson and Deputy Fry approached Mire and Camel and asked to speak with them. Both officers were casually dressed and did not display any weapons. Mire and Camel agreed to the conversation. Agent Johnson identified himself as a police officer and began questioning Mire. Deputy Fry did not actively question either Mire or Camel at that point. Agent Johnson asked Mire where he was from, and Mire, speaking with a "Caribbean type accent," responded that he was from New York. Johnson then asked Mire where he was born, and Mire replied that he had been born in Jamaica. In response to further questions, Mire indicated that he was travelling with Camel, and that their destination was Cleveland, Ohio. Mire, who stated that he was not a United States citizen, was unable to provide Johnson with a green card or any other type of immigration document to show his lawful status in the United States, representing only that he was in the United States pursuant to a visa, which he could not locate. At that point, Agent Johnson asked Mire to accompany him to the NFTA police office while Johnson contacted the United States Border Patrol. Agent Johnson told Camel that he could come to the NFTA office with Mire, or he could wait outside in the terminal. Camel chose to accompany Mire to the NFTA office. Detective Terranova, who had been approximately three to four feet away while the questioning was taking place, followed the officers into the NFTA office, standing near the door but leaving it open.

Once in the NFTA office, Agent Johnson contacted the Border Patrol, advising that Mire might be an illegal alien. The dispatcher stated that a Border Patrol agent was en route to the NFTA terminal. Agent Johnson then asked Mire if he had any type of identification with him, or in his carry-on bag, to which Mire responded that he had no identification on his person, but that Johnson could look in his bag. Agent Johnson asked Mire if there was anything in the bag which should not be there, and Mire responded no, picking up the bag from the floor and placing it on top of the desk. At that time, neither Mire nor Camel knew that Agent Johnson or Deputy Fry were narcotics agents. Agent Johnson went through the bag, finding various articles of clothing and a new pair of men's sneakers. Upon a closer observation of the sneakers, Johnson noticed that one had a much thicker inner sole than the other. Agent Johnson, who had previous experience with an individual who had secreted narcotics within the soles of his shoes, examined the sneaker more closely, and upon finding an area where the sneaker appeared to have been taken apart and put back together again, peeled the two sections apart, finding a bag containing a white powder in chunks.

At the same time as Agent Johnson was questioning Mire in the NFTA office, Deputy Fry proceeded to question Camel. When Camel indicated that he did not possess any identification, Detective Terranova noticed a wallet in Camel's back pocket, and asked

Camel if he had a wallet there. Camel then removed the wallet from his pocket and produced three identifications, all in the name of Juliet Campbell, Camel's aunt in Cleveland. Deputy Fry returned the identifications to Camel, and then told him that the officers were all narcotics agents, and asked him if he could look in his carry-on bag. Camel consented to the search, picking his bag up off the floor and putting it on a cabinet. Agent Johnson, having discovered a powdery white substance in Mire's luggage, told Fry to look for a pair of sneakers in the bag. Fry discovered a pair of sneakers, and checked underneath the inner sole, finding a clear plastic bag containing a white powder and chunks in each sneaker. Also in one of Camel's sneakers was an Ohio State driver's license bearing the name of "Andre Camel," with a photograph bearing a strong likeness to Camel.

Agent Johnson field tested the contents of one of the clear plastic bags, and the test revealed the presence of cocaine. Mire and Camel were then placed under arrest, and were advised of their *Miranda* rights. The agents shut the door of the NFTA office and conducted a body search of Mire and Camel, finding clear plastic bags containing a white powdery substance within the soles of the sneakers that both were wearing. Deputy Fry looked at Camel's wallet a second time, discovering a picture of Mire inside the wallet. After examining the wallet, Deputy Fry then had a conversation with Mire and Camel in which they expressed an interest in cooperating. They indicated that the cocaine had come from New York City from a "Raymond" (last name unknown), and was going to Cleveland to a "Roderick" (last name unknown), who was the overseer of the drug operation located in New York City. They stated that they were going to be paid two thousand dollars to deliver the cocaine to Cleveland, and they then provided the agents with "Roderick's" pager number. They also stated that they had made such trips to deliver cocaine in the past.

## DISCUSSION

1. *Initial Questioning of Defendants, and Search of Their Bags*

■ The Second Circuit has made it clear that there are three types of encounters between law enforcement officers and individuals, each with different ramifications under the Fourth Amendment. *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir.1992); *United States v. Hooper*, 935 F.2d 484, 490 (2d Cir.), *cert. denied* —— U.S. ——, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991). The first is a consensual encounter, where an individual agrees to speak to law enforcement personnel in the absence of any duress or coercion. *Hooper*, 935 F.2d at 490. Such an encounter may be initiated by the police without any objective level of suspicion, and does not, without more, amount to a "seizure" implicating Fourth Amendment protections. *Glover*, 957 F.2d at 1008. The second involves a limited investigative stop based on " 'a reasonable suspicion supported by articulable facts that criminal activity may be afoot.' " *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989)); *Hooper*, 935 F.2d at 490. The third is an arrest, which must be based upon probable cause that a crime has been committed. *Id.* Both the second and the third types of encounter are "seizures" within the meaning of the Fourth Amendment. *Id.*

■ In determining whether an individual was "seized" during the course of an encounter, triggering Fourth Amendment protections, the Court must consider "if, in view of all of the circumstances surrounding the [encounter], a reasonable person would have believed that he [or she] was not free to leave." *Glover*, 957 F.2d at 1008 (citations omitted). The "reasonable person" test is an objective one, involving an essentially legal assessment of whether the particular circumstances would warrant the belief that a person has been detained. *United States v. Montilla*, 928 F.2d 583, 588 (2d Cir.1991). Whether reasonable suspicion existed to justify the seizure is, similarly, an objective question, unrelated to the intentions or motivations of the particular detaining officer. *Glover*, 957 F.2d at 1010.

■ During the course of a lawful encounter between an individual and a law en-

forcement officer, the officer may request the individual's permission to conduct a search of his or her person or property. The government is required to show that consent " 'was in fact voluntarily given, and not the result of duress or coercion, express or implied.' " *United States v. Arango–Correa*, 851 F.2d 54, 57 (2d Cir.1988) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S.Ct. 2041, 2058–2059, 36 L.Ed.2d 854 (1973)). The test of voluntariness is whether the consent was the product of an essentially free and unconstrained choice by its maker, and is a question of fact to be determined from all of the surrounding circumstances. *Id.*

■ If consent to a search was obtained during the course of, or following, an illegal seizure, the government bears the burden of showing that the taint of the unlawful seizure had dissipated before the consent was given. *Montilla*, 928 F.2d at 590, n. 3; *see also, United States v. Babwah*, 972 F.2d 30, 34 (2d Cir.1992).

■ Where an individual has voluntarily given consent to a search, the search must not have exceeded the scope of the consent given. The standard for determining the scope of consent is that of " 'objective reasonableness'—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. Davis*, 967 F.2d 84, 87 (2d Cir.) (quoting *Florida v. Jimeno*, 500 U.S. 248, 249–252, 111 S.Ct. 1801, 1803–1804, 114 L.Ed.2d 297 (1991)), *cert. denied*, —— U.S. ——, 113 S.Ct. 356, 121 L.Ed.2d 270 (1992).

a. *Mire*

The Magistrate Judge found that the initial encounter between Mire and agent Johnson was consensual, not an unlawful investigative stop. Item 22, p. 11. He found further that at the time Johnson requested that Mire accompany him to the NFTA office, there was reasonable suspicion to believe

that Mire may not have been in the United States lawfully. *Id.* Without making any explicit ruling that Mire had been "seized" at that time, he cited *United States v. St. Kitts*, 742 F.Supp. 1218, 1220–1221 (W.D.N.Y.1990) in support of the proposition that under such circumstances, a defendant is seized within the meaning of the Fourth Amendment. *Id.* at 11–12.[4] He went on to find that Mire had consented voluntarily to the search of his bags, *Id.* at 13–15; that Mire had not sought to limit the scope of the search; that Johnson had given sufficient warning to Mire that if there was contraband in the bag it would be discovered; and that Johnson's actions in peeling apart the soles of Mire's sneakers was within the scope of the consent given. *Id.* at 15–16.

In his objections, Mire makes two arguments. First, he maintains that the consent that he allegedly gave to the search of his bag was not freely and voluntarily given. Item 24, pp. 1–6. Second, he argues that the consent was strictly limited to a search for identification, and that Johnson's actions in minutely examining the clothing and sneakers in the bag, and peeling up the inner soles of the sneakers, exceeded the scope of that consent. *Id.* at 6–13.

■ I find that the search of Mire's bag exceeded the scope of the consent given. The entire thrust of Johnson's encounter with Mire was directed towards establishing Mire's immigration status in the United States. When Johnson first approached Mire and Camel in the public area within the NFTA terminal, he questioned Mire about where he was from, and where he had been born. Mire admitted that he was not a United States citizen, but could provide no immigration document to establish that he was in this country legally. Johnson asked Mire to accompany him to the NFTA office, advising him that he was "going to contact Border Patrol and see what they wanted to do." (T.I. 36).[5] Once in the NFTA office, Johnson

---

4. A finding that Mire was "seized" at this point is consistent with the Second Circuit's holding in *Glover*, 957 F.2d at 1009 ("when [police officer] Terranova requested Glover to leave the public area of the [Buffalo bus] terminal and to return to the NFTA security office for further questioning, without returning Glover's identification and

without telling Glover that he was free to leave, we believe that Glover and his bags were seized").

5. T.I. references are to the page number of the record of the first day of the suppression hearing before the Magistrate Judge, July 1, 1993 (Item

contacted the Border Patrol, advising that Mire might be an illegal alien. He then proceeded again to question Mire about whether he had any identification on him. When Johnson asked if he had any identification in his bag, Mire replied "no, you can take a look if you want," (T.I. 42), and picked up the bag and placed it in front of Johnson. Johnson had not told Mire that he was a DEA agent, or indicated that he would be searching for narcotics as well as for identification. He did, however, ask Mire whether there was anything in the bag that shouldn't be there. Mire responded that there was not, and that Johnson could take a look. (T.I. 42).

Under the standard set forth by the Supreme Court in *Florida v. Jimeno*, 500 U.S. at 249–252, 111 S.Ct. at 1803–1804, the question to be asked is whether it would have been reasonable for Johnson to consider Mire's consent to search his bag for identification to include consent to conduct a minute examination of the insides of his sneakers and peel apart their soles.[6] I find that it would not. The space between the inner and the outer sole of a sneaker is not one that is widely used by reasonable people as a place to carry documents or other objects by which

they might be identified. It is inconceivable that the "typical reasonable person" would have understood from the exchange between Johnson and Mire that Johnson would go so far as to remove the sneakers' inner soles.[7]

This conclusion is not altered by the fact that Johnson asked Mire whether there was anything in the bag that should not be there, or that Mire replied that there was not. A reasonable person would have interpreted Johnson's question as a warning that his search for identification might *incidentally* reveal the presence of any contraband that might be in the bag, not as a request for consent to conduct a detailed examination of articles that would be most unlikely to assist in revealing identity.[8,9]

Since the cocaine in Mire's sneakers was found only after the search of his bag had exceeded the scope of consent, it is unnecessary for the Court to consider whether that consent was freely and voluntarily given.

### b. *Camel*

The Magistrate Judge found that Camel entered the NFTA office voluntarily to accompany Mire, his travelling companion, and that Camel's initial encounter with Deputy

---

13), and are given where I find that the record contains significant testimony that was not referred to in the Magistrate Judge's account of the facts. T.II. references are, similarly, to the page number of the record of the second day of the suppression hearing, July 15, 1993 (Item 12).

6. Johnson testified that "as I was going through [the bag], I discovered a pair of brand new men's sneakers. I looked at them, and *when I compared the two*, I could see one had a much, much thicker [inner] sole than the other one. Based on that, I looked at—*very, very closely at the one that had the very thick sole.*" (T.I. 44 (emphasis added)). He continued, "I examined the one with the thicker insole a little carefully. I could see where it had appeared to have been taken apart and put back together again, and based on that I peel it away ..." (T.I. 46).

7. Johnson conceded that he did not ask Mire whether he could examine the sneakers, or tear their soles apart. (T.I. 93).

8. Of course, if Johnson had been more candid with Mire, and told him that he was a narcotics agent and that the search of the bag would be a search for drugs as well as for identification,

there would have been a strong argument that the search did not exceed the scope of consent. It would not be unreasonable for the typical innocent traveller to expect that a narcotics agent's search for drugs would include a close examination of articles of clothing, shoes, and other items for hiding places where drugs might be secreted. *See Florida v. Jimeno*, 500 U.S. at 251–252, 111 S.Ct. at 1804.

9. In finding that the search of Mire's bag was within the scope of the consent given, the Magistrate Judge relied on *United States v. Villegas*, 928 F.2d 512 (2d Cir.), cert. denied, —— U.S. ——, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991). Item 22, p. 16. This reliance is not well founded, however, for two reasons. First, in *Villegas* the officer had approached the defendant and asked him generally what was in his bag, and the defendant had told him to look for himself. 928 F.2d at 515. Unlike the present case, there was no prior exchange between the officer and the defendant concerning the purpose of the search. Second, *Villegas* was decided before the Supreme Court set out the "objective reasonableness" standard in *Florida v. Jimeno*, 500 U.S. at 249–252, 111 S.Ct. at 1803–1804, and the Second Circuit did not apply any such standard in the decision. *Villegas*, 928 F.2d at 518.

Fry within the NFTA office was consensual. Item 22, p. 12. He found further that Camel's consent to the search of his bag had not been coerced, *Id.* at 13–15; and that the search did not exceed the scope of the consent given. *Id.* at 15–16.

 It seems clear enough that Camel entered the NFTA office voluntarily. I find, however, that during the course of Fry's questioning of Camel the encounter ripened into a seizure, and that the seizure was an unlawful one. I find further that Camel's consent to the search of his bag was tainted by the illegal seizure, and was not sufficient to justify the search.

The Second Circuit has enumerated certain factors that may guide the determination of whether a seizure has taken place, including:

the threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*Glover*, 957 F.2d at 1008 (quoting *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990)). These factors are not, of course, the only ones that may be considered. The court must decide whether, under *all* of the circumstances surrounding the encounter, a reasonable person would have believed that he or she was free to leave. *Id.*

In the present case, we clearly have the first of the factors enumerated in *Lee* and *Glover*—the threatening presence of three officers. In addition, the officers' questioning of Camel took place in a police office. While it is true that he had not been asked to accompany the officers into the NFTA office, the circumstances were quite different from those of the usual consensual encounter occurring in a public place. And a third factor must also be considered—the coercive effect of the officers' persistent questioning of Camel when his travelling companion, Mire, was under suspicion, was being questioned, and had consented to a search of *his* bag.

Johnson and Fry acknowledge that Camel had not been required to come into the NFTA office, and that he entered only to accompany Mire. (T.I. 86; T.II. 19, 87). Nevertheless, at the same time that Johnson was questioning Mire, who was clearly suspected of being in the United States illegally, Fry began to question Camel. When Camel told Fry that he was carrying no identification, Detective Terranova, who was positioned near the doorway (T.I. 41), apparently observed a wallet in Camel's back pocket and asked him if it contained any identification. (T.II. 25). Camel removed the wallet from his pocket, produced three IDs, and handed them to Fry. All were in the name of Juliet Campbell, Camel's aunt. By the time Fry was inspecting the IDs, Johnson had already obtained consent to search Mire's bag. (T.II. 27). After returning the IDs to Camel, Fry announced that the officers were all narcotics agents "concerned with drugs being brought into the City," (T.II. 27–28), and asked Camel if he could search his bag.

Considering all of the circumstances, I find that by this point any reasonable person in Camel's position would have believed that he was not free to leave. Camel was in a police office, not a public place. Three officers were present and focusing their attention on him and his travelling companion, Mire. One of the officers, Terranova, was positioned close to the doorway while the other two agents were questioning Camel and Mire. Johnson had indicated to Camel that he was not required to enter the NFTA office, but when he did come in, Fry and Terranova had made it clear that they were anxious to establish who he was, and were dissatisfied with his failure to produce identification. Mire was under suspicion of being in the United States illegally; like Camel, he had been unable to produce any identification, and as a result had been subjected to questioning, and had given consent to a search of his bag. After Camel had told Fry that he had no identification, Terranova had continued to pursue the matter by asking whether he had a wallet in his pocket, and if the wallet contained any ID. By so doing, Terranova had clearly signalled that Camel was expected to produce the wallet or its contents

for inspection. Fry had identified himself and the other officers as narcotics agents and had expressed an interest in searching his bag. None of the officers had given Camel any indication that he was free to leave. Both the Supreme Court and the Second Circuit have held that under substantially similar circumstances, defendants had been effectively seized for purposes of the Fourth Amendment. *Florida v. Royer,* 460 U.S. 491, 501–507, 103 S.Ct. 1319, 1326–1329, 75 L.Ed.2d 229 (1983); *Glover,* 957 F.2d at 1009 (*supra,* n. 4).

Our inquiry may not end, however, with a determination that Camel had been seized by the time that Deputy Fry requested consent to search his bag. We must consider next whether there existed a reasonable suspicion that Camel was carrying narcotics, sufficient to justify a limited investigative detention. *Glover,* 957 F.2d at 1009. In cases of suspected narcotics trafficking:

> an officer's suspicion will be reasonable if, considering the totality of the circumstances surrounding the stop, "the conduct would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer."

*Id.* at 1010 (quoting *United States v. Villegas,* 928 F.2d 512, 516 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991)). This might be described as the "reasonable narcotics agent" standard.

In this case, we are hampered by the fact that while Camel has argued that no reasonable suspicion existed to justify his seizure, Item 15, pp. 13–22, the government has maintained that no seizure actually occurred. Item 18, pp. 9–15. In consequence, the government has neither (i) set out for the Court the reasons Johnson and Fry may have had for suspecting that Camel was engaged in criminal activity, nor (ii) attempted to persuade the Court that the agents' suspicions were justifiable under the "reasonable narcotics agent" standard.

■ Nevertheless, I have reviewed the record in an attempt to establish what it was that raised the agents' suspicions. It appears that between the time Mire and Camel got off the bus from New York City and the time Johnson and Fry first approached them, the only actions taken by the defendants that seemed suspicious to the agents were Camel's stopping, turning around and walking away at the time he saw Officer Jones and Deputy Fry, and the two defendants' subsequent repeated turning around and looking back at Jones and Fry.[10]

There may be many reasons why a perfectly innocent traveller would walk in one direction, then turn around and walk the other way. Camel's doing so may well have been entirely unrelated to his seeing Jones and Fry. Equally, there may be a variety of reasons why an innocent traveller, particularly a young black male passing through the Buffalo NFTA bus terminal in the early hours of the morning, might wish to avoid approaching a police officer who was evidently focusing attention on him.[11] The terminal is well known as a place where law enforcement officials employ particularly aggressive tactics. *Hooper,* 935 F.2d at 500 (Pratt, J., dissenting). One Court of Appeals Judge has even suggested that a sign be posted at the New York City Port Authority building advising against taking the express bus to Buffalo, "for those who prefer not to be interrogated by DEA agents or local deputy sheriffs in Erie County as to their identification, place of employment, or reason for coming to Buffalo, or to be asked whether their luggage can be searched to see if they are carrying narcotics." *Glover,* 957 F.2d at

---

**10.** Johnson testified that he started paying attention to Mire and Camel when, after getting off the bus, they talked outside the terminal for two to three minutes, then walked into the terminal and separated. (T.I. 21, 23). Johnson noticed that Mire walked along one side of the building in a southerly direction, while Camel proceeded to the center of the concourse and then started to walk in the same direction as Mire. At that point Johnson was "just observing them," (T.I. 24),

and their actions had apparently not yet raised his suspicions.

**11.** Fry testified that Camel made eye contact with Officer Jones before turning away. (T.II. 9; T.II. 59–60). This merely suggests that Camel may have become aware at that time that Jones was watching him.

1015 (Oakes, C.J., dissenting). Law enforcement agents at the Buffalo NFTA bus terminal should not have their suspicions raised, or even be surprised, if travellers turn around and walk away from officers who are watching them.

Similarly, there is no reason to think that, once a traveller knows that he has become the focus of a police officer's attention, it should be "suspicious" for him to turn around to see whether the officer is continuing to watch him. The defendants' actions in repeatedly turning to look at Jones and Fry must be viewed in this light. Obviously, they knew they were being watched. Any innocent traveller in the same situation would be likely to make periodic checks to see whether he was still the object of the officer's attention.

Once Fry had begun questioning Camel in the NFTA office, his suspicions apparently became heightened when Camel could not produce any identification other than three IDs in the name of his aunt, Juliet Campbell. It was immediately after seeing the IDs in Ms. Campbell's name that Fry announced to Camel that the officers were all narcotics agents concerned with drugs being brought into Buffalo, and asked if he could search Camel's bag. Why Camel's inability to produce identification, or his possession of IDs in his aunt's name, suggested to Fry that Camel might be carrying drugs is a mystery. United States citizens are not required to carry identification. And although Camel's possession of IDs in the name of his aunt might raise questions in the mind of a police officer, there is no suggestion that he was attempting to use them to conceal his identity, or for any other illicit purpose. Again, the connection with narcotics trafficking seems to be entirely missing.

I conclude that by the time Camel was asked by Fry for consent to the search of his bag he was the subject of an illegal seizure, because at that time there was no reasonable suspicion, supported by articulable facts, that he was involved in criminal activity. *See Glover,* 957 F.2d at 1008.

Since Camel was detained illegally when he consented to the search of his bag, I must now consider whether the illegal seizure tainted the consent. *Montilla,* 928 F.2d at 590, n. 3 (citing *Wong Sun v. United States,* 371 U.S. 471, 483, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963)). I find that it did. The Second Circuit has indicated that an illegal investigative stop invalidates consent unless the government bears its burden of showing that the taint of the illegal stop had dissipated before the consent was given. *Id.* Four factors are relevant: whether *Miranda* warnings were given, the temporal proximity of the stop and the consent, the presence of intervening circumstances, and the purpose and flagrancy of the illegal stop. *Id.* In this case, no *Miranda* warnings were given prior to Camel's consent to the search, the consent was given almost contemporaneously with the encounter ripening into an illegal seizure, there were no intervening circumstances, and the purpose of the stop appears to have been nothing more than an unlawful fishing expedition. I have no reason at all to find that the taint of the illegal stop was in any way dissipated before Camel gave his consent to the search.

2. *Subsequent Arrest and Search of Defendants, and Statements Made Following the Arrest*

Immediately after cocaine was discovered in Mire and Camel's bags, the defendants were formally placed under arrest, advised of their *Miranda* rights, and strip-searched. More cocaine was found. Soon thereafter, while still at the NFTA office, the defendants allegedly made statements concerning where and from whom they had received the cocaine, where and to whom it was to be delivered, how they were to contact the person to whom the cocaine was to be delivered, how much money they were to receive, and that they had been engaged in delivering drugs on previous occasions.[12] The defendants argue that the physical evidence and the alleged statements should be suppressed, since they were obtained incident to an illegal arrest.

It is clear that it was the discovery of cocaine in the sneakers in defendants' bags,

12. The statements were not reduced to writing.

and nothing else, that precipitated their arrest. Since the search of Mire's bag exceeded the scope of the consent given, and the search of Camel's bag was conducted pursuant to his illegal seizure, I find that both defendants were placed under arrest without probable cause.

In determining whether the physical evidence and statements obtained following the defendants' arrests should be suppressed, I must decide whether "subsequent events sufficiently attenuated the taint of the unconstitutional arrest to allow introduction" of the evidence at trial. *United States v. Ceballos,* 812 F.2d 42, 49–50 (2d Cir.1987) (citations omitted). The Government bears the burden of proving a break in the causal chain. *Id.* at 50. Again, four factors are relevant: whether *Miranda* warnings were given, the temporal proximity of the detention and the subsequent search and statements, the presence of intervening circumstances, and the purpose and flagrancy of the illegal arrest. *Id.; see also, United States v. Pena,* 961 F.2d 333, 338 (2d Cir.1992). *Miranda* warnings by themselves do not preclude a determination that the physical evidence or statements must be suppressed. *Pena,* 961 F.2d at 338.

In this case, I have no difficulty in finding that the physical evidence and statements obtained from Mire and Camel following their arrest must be suppressed. The strip searches leading to the discovery of the cocaine in the sneakers that they were wearing took place immediately after the *Miranda* warnings were given, and the subsequent questioning leading to the statements they seek to suppress evidently took place only a few minutes later. All of these events were "too closely connected in context and time to the illegal arrest[s] to break the chain of illegality." *Ceballos,* 812 F.2d at 50.

### CONCLUSION

For the reasons given above, defendants' motions to suppress the physical evidence and statements obtained at the time of their arrest on April 16, 1993, are granted.

So ordered.