**UNITED STATES of America,**

v.

**Marcus LAND, Defendant.**

**No. 94–CR–097A.**

United States District Court,
W.D. New York.

Dec. 29, 1994.

Patrick Nemoyer, U.S. Atty. (Thomas S. Duszkiewicz, Asst. U.S. Atty., of counsel), Buffalo, NY, for U.S.

Kimberly A. Schechter, Asst. Fed. Public Defender, Buffalo, NY, for defendant.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Carol E. Heckman, pursuant to 28 U.S.C. § 636(b)(1) on June 28, 1994. On July 13, 1994, defendant filed a motion to suppress. On October 18, 1994, Magistrate Judge Heckman conducted a suppression hearing and on December 2, 1994, filed a Report and Recommendation recommending that defendant's motion be denied.

This Court, having carefully reviewed Magistrate Judge Heckman's Report and Recommendation, as well as the submissions of the parties, and no objections having been timely filed, it is hereby

ORDERED, that pursuant to 28 U.S.C. § 636(b)(1), and for the reasons set forth in Magistrate Judge Heckman's Report and Recommendation, defendant's motion for suppression is denied.

IT IS FURTHER ORDERED that the parties shall appear in Part II of this Court at 9:00 a.m. on December 30, 1994 for a meeting to set a trial date.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

HECKMAN, United States Magistrate Judge.

The defendant is charged in a two-count indictment with possession of 50 grams or more of cocaine base with intent to distribute and simple possession, in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A) and 844(a). The charges are based on the defendant's arrest at the NFTA bus terminal in Buffalo, New York on May 6, 1994.

Following indictment, the defendant moved to suppress drugs seized upon his arrest as well as oral statements made at the time of his arrest on the basis that he was unlawfully seized at the bus station. On October 18, 1994, a suppression hearing was held on defendant's motion. Following the suppression hearing, both counsel were given an opportunity to submit additional case law authorities to the court. The motion was taken under advisement as of November 2, 1994.

For the reasons set forth below, it is recommended that the defendant's motion be denied.

### BACKGROUND

DEA Agent Bruce Johnson and Niagara County Sheriff's Deputy Randy Fry testified at the suppression hearing.

**1. The Testimony of Agent Johnson.**

Agent Johnson testified that on May 6, 1994, he was present at the bus station when a Trailways bus arrived from New York City at approximately 5:50 a.m. Johnson was wearing plain clothes and was inside the terminal in the vicinity of Gate 19 looking through the glass vestibule area. He observed the defendant and an individual later identified as Arthur Woods getting off the bus together as a few of the last passengers. They had no checked baggage, but Woods was carrying a backpack. The bus arrived at Gate 21. The defendant stopped and waited while Woods started walking toward the Gate 19 entrance, where Agent Johnson was standing inside the glass partition. As Woods approached Johnson's location, he stopped, made eye contact with Johnson, and then abruptly turned and went to Gate 17

where he entered the terminal. At the same time, defendant entered the terminal at Gate 21 and followed Woods approximately 25 feet behind him. As both individuals walked through the terminal, they frequently turned around and looked back toward Agent Johnson. They both exited the terminal through the North Division Street exit.

Johnson and Deputy Fry, who was also in plain clothes, followed the individuals through the terminal and approached them as they exited the building. Both agents displayed their badges and announced that they were police officers. Johnson asked to talk to them. Johnson then began talking to Woods and Fry began talking to defendant. They were standing in an opening between the sidewalk and a wind break outside the terminal. The defendant and Fry were approximately 3–4 feet away from Johnson and Woods.

Once they approached and identified themselves, Woods told the defendant, "Here, take your bag," and handed the backpack to the defendant. The defendant took the bag into his hands. The agents then questioned both individuals as to the purpose of their travel. Woods advised Johnson that he knew the defendant from Buffalo and that he happened to run into him on the bus from New York City. Johnson asked Woods why he was carrying the defendant's bag and he said that he was doing him a favor since both of them would be taking a cab.

Johnson then talked to Fry and learned that the defendant had given different information to Fry. Fry advised Johnson that the defendant claimed to be in New York City for a few days to shop, that Woods was his cousin and that they were traveling together. Agent Johnson then asked Woods if the black bag was Woods' bag and Woods responded by pointing toward defendant and saying, "No, that's his bag." Fry then asked the defendant if the bag he was now holding was his and he responded, "Yeah, it's my bag."

Fry then advised defendant that he and Johnson were narcotics officers concerned with drugs being brought into the Buffalo area and asked for permission to search the bag. The defendant was also told that he was not under arrest and did not have to allow Fry to examine the bag. The defendant responded, "Okay, sure." Fry then again asked for permission to search the bag and defendant again said, "Yes." Defendant then handed the bag to Fry. Fry unzipped the bag, removed a large plastic bag and said, "There's some crack in here." Meanwhile, Woods had asked Johnson if he could sit down against the cement wall and Johnson had said, "Go ahead." Johnson had then asked Woods to stand up and come into the NFTA police office at the bus station. Fry asked defendant to do the same thing. Both came into the office.

At the NFTA police office, two uniformed police officers were present, a border patrol agent and an NFTA police officer. The contents of the plastic bag were field-tested and the result was positive for cocaine. The defendant was read his *Miranda* rights. Johnson again asked the defendant if this was his bag and he replied, "I'll take the bag." Johnson then said, "I didn't ask you if you'd take it but is it yours?" Defendant replied, "Yes."

Woods was patted down and a computer check was run to see if there were outstanding warrants, which there were not. He was then allowed to leave.

The defendant was then interviewed by the agents. He was asked how much the crack cost. He said that he did not recall. He was asked if Woods would know and he said, "Probably." A search of the bag revealed two Continental Airline tickets from Buffalo to New Jersey which had already been used, two ticket receipts, a set of keys and the drugs already referred to.

Woods was described as approximately 6' to 6'1" in height, African–American, approximately 200 lbs. Defendant stands 5'4" to 5'5" and is approximately 135 lbs. On cross examination, Johnson admitted that he had suspected that Woods was involved in the transaction because he was carrying the bag initially but once the defendant admitted owning the bag he felt he had no choice but to let Woods go and to press charges against defendant. That is why he asked defendant again inside the NFTA police office whether

it was his bag. When the defendant again stated it was, Johnson felt he had no choice. It was also brought out on cross examination that Woods had a lengthy criminal history whereas the defendant had no prior arrests, that Woods had more cash in his possession than the defendant and that Woods gave two addresses to the police.

## 2. The Testimony of Deputy Fry.

Randy Fry testified that he assisted Johnson on May 6, 1994 in the questioning of defendant and Woods and the ultimate arrest of defendant. He testified to essentially the same facts as Johnson.

Fry spoke to Land and Johnson spoke to Woods when they stopped the two travelers. As soon as they identified themselves, Woods gave the backpack to the defendant and said, "Here, here's your backpack." The defendant just took the bag. Fry then asked the defendant where he had been and he advised that he had been in New York City. He asked how long he had been there and he replied, "A couple of days." Fry asked him his purpose and defendant said, "Shopping." As far as Woods goes, defendant said he was traveling with Woods and that Woods was his cousin. Fry asked him whether the backpack was his and defendant replied that it was. He then conferred with Johnson who meanwhile had been talking with Woods. They learned that the story told by Woods contained different information and therefore decided to question the individuals further.

Johnson again asked Woods if the bag was his and Woods replied, "No." Defendant was asked if it was his and he replied, "Yes." They then told the individuals that they were narcotics officers looking for drugs and asked if they had any drugs. Defendant denied having any drugs. Fry then asked if he could search the bag. Defendant said, "Yes." Fry said, "You know you don't have to allow it. You're not under arrest. Are you sure I can search?" Defendant again said, "Yes," and handed the bag to Fry. This entire conversation occurred outside the terminal just outside the doors.

Fry then unzipped the bag, and located in the bottom of the bag a clear plastic bag containing chunks of an off-white substance. They then took the two individuals to the NFTA police office where they field tested the substance and found it positive for cocaine. The individuals were read their rights. Defendant stated that he understood his rights. He was asked, "Is this your bag?" Defendant said, "I'll take the bag." Johnson then said, "I didn't ask you if you would take the bag. Is this your bag?" The defendant replied, "Yes."

Woods was patted down and his record was checked. There were no warrants outstanding and therefore he was released. Upon questioning, defendant was asked how much he paid for the crack and he said that he did not know. He was asked if Woods would know and he stated, "Probably."

Defendant moves to suppress the drugs and the oral statements he made to the agents. He argues (1) that he was unlawfully seized without reasonable suspicion or probable cause, and (2) that the consent to search was not voluntarily given. Each of these arguments will be discussed in turn.

## *DISCUSSION*

### 1. Seizure.

■ It is well-established that not every encounter between a police officer and a citizen is a seizure implicating the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). "Certainly, a police officer is free to approach a person in public and ask a few questions; such conduct, without more, does not constitute a seizure." *U.S. v. Lee*, 916 F.2d 814, 819 (2d Cir.1990) (citing *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983)). As the Supreme Court stated in *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991):

We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, the court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not

free to decline the officers' requests or otherwise terminate the encounter.

501 U.S. at 439, 111 S.Ct. at 2389.

■ Under these general parameters, the Second Circuit has identified three types of encounters that may occur between law enforcement officers and individuals, each with different Fourth Amendment ramifications. The first type is a consensual encounter in which an individual willingly agrees to speak to police, even when the officers have no basis for suspecting the individual of any criminal activity. During such an encounter, police "may generally ask questions of that individual ...; ask to examine the individual's identification ...; and request consent to search his or her luggage ... as long as the police do not convey a message that compliance with their requests is required." *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir.1992) (quoting *Florida v. Bostick, supra*, 501 U.S. at 432–35, 111 S.Ct. at 2385–87); *see also United States v. Hooper*, 935 F.2d 484, 490–91 (2d Cir.), *cert. denied*, 502 U.S. 1015, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991).

■ The second type of encounter involves a limited "investigative stop" of an individual and his or her bags, under the principles set forth in *Terry v. Ohio, supra*. Though limited in scope, such investigative stops are "seizures" under the Fourth Amendment requiring the officer's objective justification based on reasonable suspicion of criminal activity. *Glover, supra* at 1008–09; *United States v. Sokolow*, 490 U.S. 1, 9–10, 109 S.Ct. 1581, 1586–87, 104 L.Ed.2d 1 (1989).

■ The third type of encounter involves an arrest of the individual, which must be based on probable cause that a crime has been committed. *Glover, supra* at 1008; *Hooper, supra* at 490.

■ In this case, the testimony presented at the suppression hearing shows that the initial encounter between the agents and the defendant was consensual. The encounter took place outside of the terminal in a public area. Johnson approached Woods and Fry approached defendant. No weapons were displayed and no physical force or threats of force were used.

Both officers testified that after conducting their initial questioning they discovered that defendant and Woods had given them inconsistent information, and they decided to investigate further. Under the authority of the cases discussed above, the encounter at that point ripened into an "investigative stop" requiring a showing of reasonable suspicion that the suspects were carrying drugs or were engaged in other criminal activity.

■ The record shows that the defendant and Woods arrived on the early morning Trailways bus from New York City, a "source city" of narcotics for western New York. *Glover, supra* at 1010. They left the bus together, among the last few passengers. They had no baggage other than the backpack Woods was carrying. When Woods made eye contact with Agent Johnson he stopped, turned and entered the terminal at another gate. Both Woods and the defendant frequently looked back at Johnson as they walked through the terminal. When approached outside the terminal, Woods gave the backpack to defendant. Upon questioning, the information they gave the agents conflicted in several respects.

These circumstances, viewed objectively by officers familiar with the practices of drug couriers, gave rise to a reasonable suspicion of drug trafficking activity so as to justify a limited investigative stop of defendant and Woods for further investigation. *Glover, supra* at 1010–11; *United States v. Sokolow*, 490 U.S. 1, 9–10, 109 S.Ct. 1581, 1586–87, 104 L.Ed.2d 1 (1989). Having reasonable suspicion, the officers were justified in detaining the individuals long enough to obtain the defendant's consent to search the bag he was carrying.

Defendant relies on *United States v. Mire*, 851 F.Supp. 96 (W.D.N.Y.1994), in which Judge Curtin suppressed narcotics seized from two defendants at the NFTA bus terminal by the same two officers under similar circumstances. However, Judge Curtin's decision was based on clearly distinguishing factors. In that case, the detailed search by the officers exceeded the scope of the consent given by one of the defendants to search his bag for immigration documents, at 101–102, and the other defendant was detained

illegally because the officers could not articulate any facts to support their suspicion that he was involved in drug trafficking activity. *Id.* at 105–106. In this case, the circumstances of the encounter—including the conflicting information given to the officers by the two travelers—gave rise to a reasonable suspicion of criminal activity. Also, as discussed below, the search of the backpack was within the scope of the consent given by defendant after the agents had identified themselves as narcotics officers.

Accordingly, based on the evidence presented at the suppression hearing, I find that the agents' conduct during the initial encounter with and investigative detention of the defendant did not violate the fourth amendment. The remaining question is whether consent to search was validly given by the defendant.

## 2. Consent.

■ A warrantless search conducted pursuant to a valid consent is constitutionally permissible. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). The government has the burden of establishing by a preponderance of the evidence, "with clear and positive testimony," *United States v. Dewitt,* 946 F.2d 1497, 1500 (10th Cir.1991), *cert. denied sub nom. Rison v. United States,* 502 U.S. 1118, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992), that the defendant's consent was "freely and voluntarily given." *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); *see also United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1878–79, 64 L.Ed.2d 497 (1980); *United States v. Matlock,* 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974).

Defendant argues that he did not voluntarily consent to a search of the bag. This argument must be rejected for several reasons.

■ Whether consent to search was voluntarily given is to be determined by the totality of the circumstances. *Schneckloth, supra,* 412 U.S. at 227, 93 S.Ct. at 2047–48. The standard is one of " 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the [defendant]?" *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991). The evidence presented at the suppression hearing demonstrates that the officers asked defendant several times if the bag he was carrying was his, and he told them that it was. They informed him that he was not under arrest, and that he did not have to let them search the bag. He said he understood, and gave his consent to search. Woods denied ownership of the bag, and at no time did defendant state that the bag really belonged to Woods. Under the circumstances presented to the officers, it was objectively reasonable for them to conclude that the bag defendant was carrying was his, and that he freely and voluntarily consented to the search.

■ In addition, the evidence shows that the scope of the search did not exceed the scope of the consent. *See Florida v. Jimeno, supra.* The officers informed defendant that they were narcotics agents looking for drugs. The drugs were found at the bottom of the bag.

■ Finally, even if the officers could have reasonably concluded under the circumstances that the bag really belonged to Woods, the evidence presented at the hearing clearly indicates that defendant had sufficient use of, access to and control over the bag to support the officers' belief that defendant's consent was validly given. *See, e.g. United States v. Matlock, supra,* 415 U.S. at 171, 94 S.Ct. at 993; *United States v. Davis,* 967 F.2d 84, 87 (2d Cir.), *cert. denied sub nom. Content v. United States,* —— U.S. ——, 113 S.Ct. 356, 121 L.Ed.2d 270 (1992).

Accordingly, I find that the search of the backpack was conducted pursuant to valid consent. Upon conducting the search, the officers found a bag containing what appeared to be narcotics, giving them probable cause to arrest defendant.

### *CONCLUSION*

For the foregoing reasons, it is recommended that defendant's motion to suppress be denied.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 30(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson–Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek, et al. v. Canadair Ltd., et al.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 30(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 30(a)(3), or with the similar provisions of Rule 30(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.*

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the government and the defendant.

**SO ORDERED.**

**DATED: Buffalo, New York**

December 2, 1994