UNITED STATES of America, Appellant,

v.

Patrick MIRE and Andre Camel, a/k/a Andre Campbell, Defendants–Appellees.

No. 694, Docket 94–1308.

United States Court of Appeals, Second Circuit.

Argued Dec. 20, 1994.

Decided April 4, 1995.

---

Thomas S. Duszkiewicz, Asst. U.S. Atty., Buffalo, NY (Patrick H. NeMoyer, U.S. Atty.), for appellant.

Joseph B. Mistrett, Asst. Federal Public Defender, Buffalo, NY (Jonathan W. Feldman, Federal Public Defender and Michael Petrik, Jr., Law Clerk, on the brief), for defendant-appellee Mire.

John J. Molloy, West Seneca, NY, for defendant-appellee Camel.

Before: VAN GRAAFEILAND, WALKER, and CABRANES, Circuit Judges.

PER CURIAM:

The Government appeals from an order of the United States District Court for the Western District of New York (John T. Curtin, *Judge*) that granted the motions of Patrick Mire and Andre Camel ("defendants") to suppress evidence of illegal drugs possessed by the defendants and statements made by them regarding such possession. The district judge referred the matter to a United States Magistrate Judge pursuant to 28 U.S.C. §§ 636(b)(1)(A) and 636(b)(1)(B), and the magistrate judge recommended that the suppression motions be denied. The district judge rejected the magistrate judge's recommendations without an evidentiary hearing and granted the motions. *See United States v. Mire,* 851 F.Supp. 96, 98 (W.D.N.Y.1994). For the reasons that follow, we reverse.

## BACKGROUND

The relevant facts, as found by the magistrate judge and adopted by the district court, are not in dispute. On April 16, 1993 at about 7 a.m., the defendants arrived from New York City at the Niagara Frontier Transportation Authority ("NFTA") bus terminal in Buffalo. They were approached by Special Agent Bruce R. Johnson of the federal Drug Enforcement Administration ("DEA") and Niagara County Sheriff's Deputy Randall Fry, who identified themselves to the defendants as police officers. Although Johnson is an agent of the DEA, he did not identify himself as a narcotics agent.

In the course of their conversation, Mire stated that he was not a United States citizen, and he was unable to produce documentation of lawful status in the United States. Johnson asked Mire to accompany him to the bus terminal police office, where Johnson would contact the Border Patrol. Johnson told Camel that he could come into the police office or wait in the terminal. Camel chose to go to the office. A third officer, Detective Paul Terranova of the Erie County Sheriff's Department, accompanied the foursome into the office, the door of which remained open after they entered.

When Johnson contacted the Border Patrol office, he was informed by the dispatcher that a Border Patrol agent was en route to the bus terminal. Johnson then testified as follows:

Q. After you contacted the dispatch[er] for Border Patrol, did you pose any questions yourself to Mr. Mire?

A. Yes, sir, I did.

Q. And what was the nature of your inquiry inside the office?

A. Basically I asked him if he had any type of identification on him, and he said that he didn't. I asked him if had any type of identification at all in his bag, and he said no, you can take a look if you want.

Q. He made a comment about his bag?

A. Yes, sir. Well, I had asked if he [had] any identification in his bag, and he said no, take a look if you want.

Q. All right. And the bag was at his feet during this statement by him or request?

A. Yes, sir.

Q. All right. And when he indicated to you that you could take a look if you want to, did you follow that up with any question or statement?

A. Yes, sir. I asked him are you sure you don't mind, and he said no, and he picked up the bag and set it on the desk in front of me.

Q. All right. And when he did so, did you say or do anything?

A. Yes, sir. At that point I asked him if there was anything in the bag that shouldn't be there. And he said no, take a look.

Q. Why did you—why did you—

THE COURT: He picked up the tote bag from the floor and put it on top of the desk?

THE WITNESS: Yes, your Honor. He picked it up and set it down in front of me.

THE COURT: On the desk?

THE WITNESS: Yes, your Honor.

BY [ASSISTANT U.S. ATTORNEY] DUSZ-KIEWICZ:

Q. Why did you ask the question about is there anything that shouldn't be in there at that point?

A. Basically to see his response, and he just said no, go ahead and take a look.

Q. He again responded to you that you could look in the bag?

A. Yes, sir.

Upon looking into the bag, as he was told he could do, Johnson discovered a brand new pair of sneakers, one of which had a sole that was almost one inch thicker than the other. Based upon prior experience, Johnson immediately suspected that the thick sole was in fact a hiding place for drugs, and so it turned out to be—for cocaine. Accordingly, after an appropriate field test was made, Mire was placed under arrest and given his *Miranda* warnings.

At about the same time that Johnson was questioning Mire, Deputy Fry asked Camel if he had any identification with him. Camel replied that he did not. Terranova then asked Camel whether he had a wallet in his pocket. Camel produced the wallet and removed three ID cards from it, all of which were in the name of Juliet Campbell, identified as Camel's aunt. Fry then testified as follows:

Q. All right. After he showed you those three pieces of identification what did you do?

A. I returned them to him.

Q. Okay. What was Agent Johnson doing when you were observing these pieces of ID?

A. He had gotten consent to look in Mr. Mire's bag.

Q. All right. And had you directed any questions at that point to Mr. Camel relative to examining his bag?

A. Yes. I explained to him that we were narcotics officers concerned with drugs being brought into the City and asked him if he would mind letting me take a look in his bag.

Q. And what did he say when you asked him if he would mind letting you take a look in his bag?

A. He stated, go ahead.

Q. All right. Did you advise him of anything else when you requested his permission to examine his bag?

A. Yes, that he didn't have to.

Q. Okay. And what did he say when you stated he didn't have to?

A. He said, go ahead, picked the bag up and set it on the cabinet.

Q. Well, where is this cabinet in relation to where Mr. Camel was seated?

A. Sitting to the left of him.

Q. All right. And you said he picked the bag up and put it on the cabinet?

A. Yes.

Q. And he said, go ahead?

A. Yes.

Q. After he stated, go ahead, what did you do?

A. I proceeded to look into the bag.

THE COURT: He picked the bag up?

THE WITNESS: Yes.

Fry at this point had been alerted by Johnson to pay close attention to any sneakers that he found. Fry found two sneakers with false soles containing cocaine in Camel's bag, and Camel was placed under arrest. Both defendants were subjected to body searches, and additional cocaine was found in the sneakers that each defendant was wearing. Thereafter, the defendants voluntarily furnished information concerning the source and proposed destination of the drugs.

## DISCUSSION

The Supreme Court has cautioned that "courts should not indulge in 'unrealistic second-guessing'" and has stated that "'creative judge[s], engaged in *post hoc* evaluations of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.'" *United States v. Montoya de Hernandez,* 473 U.S. 531, 542, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381 (1985) (quoting *United States v. Sharpe,* 470 U.S. 675, 686–87, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605 (1985)). The legality of the officers' conduct in the instant case must be determined by considering the "totality of the circumstances—the whole picture." *United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). In the circum-

stances presented here, we believe that the district court erred in concluding that the "whole picture" rendered the searches illegal.

 We begin with Mire. After Johnson learned that a Border Patrol officer was on his way to the bus terminal, he made another attempt at getting some evidence of identification from Mire. We have described the discussion that took place and the finding of the drugs. Mire contends, however, that his consent to search was not broad enough to include the finding of drugs in the oversized sole of the sneakers. We disagree. Johnson was a law enforcement agent, Mire offered him his bag, and Johnson—before looking—asked if there was anything in the bag "that shouldn't be there." The Supreme Court has said: "The scope of a search is generally defined by its expressed object." *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 1804, 114 L.Ed.2d 297 (1991). Here, that object was a general search of the bag. It was objectively reasonable for Johnson, who suspected that drugs were contained in the sneaker, to conclude that the sneaker was within the scope of his authorized search. The Supreme Court has made it clear that if consent could "reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization." *Jimeno,* 500 U.S. at 252, 111 S.Ct. at 1804; *see also United States v. Snow,* 44 F.3d 133, 135 (2d Cir.1995) ("If the consent to search is entirely open-ended, a reasonable person would have no cause to believe that the search will be limited in some way.").

 We now turn to Camel. We address *de novo* the question of whether Camel was illegally seized. *United States v. Thompson,* 941 F.2d 66, 70 (2d Cir.1991). We disagree with the district court's conclusion that Camel was illegally seized while in the police office. No coercion of any sort was used to bring him into the NFTA police office or to prevent him from leaving. No guns were drawn or displayed. The office door was open at all times. We find little persuasive force in the district court's repeated references to the "threatening presence" of three officers in a police office.

Camel "freely placed himself in the confined environment that the district court found so troubling." *See United States v. Madison,* 936 F.2d 90, 95 (2d Cir.1991). Under the circumstances, if the district court considered the mere presence of the officers to be threatening, we disagree. *See United States v. Savage,* 889 F.2d 1113, 1116–17 (D.C.Cir. 1989); *United States v. Brady,* 842 F.2d 1313, 1314–15 (D.C.Cir.1988). If the district court was intimating that the officers were guilty of "threatening conduct," again we disagree. We can find "no harassment, no intimidation, no physical restraint, no humiliation and no prolonged questioning" in the record below. *See United States v. Price,* 599 F.2d 494, 502 (2d Cir.1979).

In sum, we do not believe that the Fourth Amendment rights of Patrick Mire and Andre Camel were violated. Accordingly, we reverse and remand for further proceedings consistent with this opinion.