**UNITED STATES of America**

v.

**Christian John RESTREPO, Alberto Caro, and Jose Francisco Guevara, Defendants.**

**No. 94–CR–551.**

United States District Court, E.D. New York.

June 6, 1995.

Zachary Carter, U.S. Atty., Brooklyn, NY by Jo–Anne Weissbart, for U.S.

Paul Testaverde, Elmhurst, NY, for defendant Alberto Caro.

Joel B. Rudin, New York City, for defendant Jose Francisco Guevara.

Jerald Levine, Jackson Heights, NY, for defendant Christian John Restrepo.

## TABLE OF CONTENTS

I. Introduction ........................................................ 186
II. Guevara's Motion to Suppress ...................................... 186
 A. Facts ......................................................... 186
 B. Which Circuit's Law Applies ................................... 191
 C. Validity of Stop and Subsequent Detention .................... 192
 1. Law .................................................... 192
 2. Application of Law to Facts ............................. 194
 a. Stop .............................................. 194
 b. Further Detention ................................. 194
 D. Search ........................................................ 196
 1. Law .................................................... 196
 2. Application of Law to Facts ............................. 197
 E. Suppression as "Fruits of Poisonous Tree" .................... 198
 1. Law .................................................... 198
 2. Application of Law to Facts ............................. 199
III. Caro's and Restrepo's Motions to Suppress ......................... 200
 A. Facts ......................................................... 200

B. Caro's Motion ............................................. 201
 1. Law ..................................................... 202
 a. Standing to Challenge Validity of Consent ................. 202
 b. Validity of Consent ...................................... 202
 2. Application of Law to Facts ................................. 204
C. Restrepo's Motion ........................................... 204
 1. Law ..................................................... 204
 2. Application of Law to Facts ............................... 206
IV. Conclusion ................................................. 207

## AMENDED MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge.

## I. INTRODUCTION

Alberto Caro, Jose Francisco Guevara and Christian John Restrepo seek to suppress statements and other evidence of a drug conspiracy. They are charged with conspiring to distribute and to possess with intent to distribute, and with possessing with intent to distribute, cocaine. 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(A)(ii)(II). They move to suppress the following statements and other evidence: Guevara: evidence and statements obtained by law enforcement officials following a traffic stop, on grounds of a series of alleged Fourth Amendment violations; Caro: tapes of conversations between himself and Guevara on the ground that the statutorily required consents to the recordings were not obtained; and Restrepo: evidence obtained as a result of a "security sweep" of his house.

Guevara's motion is granted: law enforcement officials violated his constitutional rights, starting with an illegal stop and search of his car. Caro's motion is denied: the requisite consent to his telephone conversation with Guevara was given by the latter. Restrepo's motion is granted: the search of his home was illegal.

## II. GUEVARA'S MOTION TO SUPPRESS

### A. Facts

An officer of the Memphis Police Department stopped Guevara, a swarthy Hispanic-appearing male driving a Cadillac with California license plates on an interstate highway in Tennessee. Guevara's eleven-year-old son, Rodolfo, was in the front passenger seat and his wife and two younger children were in the rear.

At a full evidentiary hearing in the Eastern District of New York, the officer testified that Guevara was speeding—driving 65 miles per hour in a 55 miles per hour zone. Guevara and Rodolfo both testified that Guevara was driving slowly because the family was seeking a place to stop for breakfast. Guevara also stated that he was driving at less than 55 miles per hour because he did not want to be intercepted while he was carrying drugs. Rodolfo testified that as they passed the police car he noticed that the car's speedometer read 47–50 miles per hour and that his mother had just chided his father for driving too slowly.

Because Guevara does not speak English, the officer used Rodolfo as an interpreter for communicating with Guevara during the stop.

Rodolfo testified that the officer stated that the reason for the stop was that Guevara was driving too closely behind a tractor trailer. Guevara testified that the officer never told him, through Rodolfo, the reason for the stop. He did, however, acknowledge driving within five or six meters of a tractor trailer. He also believes that at some point during the stop, Rodolfo told him that the officer had mentioned tailgating. The "traffic courtesy warning" issued by the officer states that Guevara was "speeding 65 MPH in a 55 MPH zone."

The officer sought and received Guevara's driver's license which he used to fill out a "courtesy warning." Guevara did not ask his son to translate the courtesy warning, believing that it was not important and that after signing it, he would be permitted to depart.

As the officer filled out the courtesy warning, he questioned Guevara and Rodolfo about their trip. According to Guevara, the officer was "burning time while he filled out the courtesy ticket, he was continuing to ask

me questions." Guevara explained that the family was headed to Queens, New York for three days' vacation. Rodolfo testified that the officer also asked Guevara if he is "Mexican."

The officer testified that during this conversation, he noticed that Guevara was growing "more and more nervous," that "[h]is hands were quivering," and that Mrs. Guevara "kept looking back like, you know, nervously every time I would talk to [Guevara,] ... a real nervous type reaction to me." Under cross examination he explained that general conversation is used to elicit signs of possible criminal activity independent of a traffic violation.

As or immediately after the officer issued the courtesy warning, a second officer arrived. According to the first officer, the second officer happened upon the scene. The second testified, however, that he had been radioed by the first, and Guevara testified that the first used the radio in his patrol car after taking Guevara's license and registration. The second officer asked Guevara many of the same questions that the first had already asked, and received consistent answers.

After Guevara signed the courtesy warning, the second officer asked if he could speak with Mrs. Guevara, and Guevara agreed. The second officer stayed with Guevara while the first went to open the driver's side door. As he opened it, he "observed that the door was overly heavy for a regular door. Felt like it was heavy to me." Then, according to the first officer, he realized that traffic was coming and that it would be better for Mrs. Guevara to exit from the other side; he shut the door and walked back to the squad car, while the second officer walked over to the passenger side door.

Through the open window of the car, the second officer attempted to communicate with Mrs. Guevara in Spanish. In response to his questions, Mrs. Guevara explained that the family was headed to New York, that they were to be gone a week, and that the trip's purpose was to visit relatives.

Based on the observed nervousness of Mr. and Mrs. Guevara, the fact of the heavy door, and what they felt were discrepancies in the Guevaras' replies to questions about the length and purpose of the trip, the officers decided to request permission to search the car. According to the first officer, it "[a]ppeared like it was more than just a speeding violation at that time. We didn't know what it was."

The second officer asked Guevara in Spanish if he had any guns or illegal drugs in the car and if he would consent to a search. According to the first, Guevara denied that there was anything illegal in the car but agreed to the search.

The second officer asked Guevara to sign a written consent-to-search form. He testified that he first explained the form in English. When Guevara looked confused, this officer flipped the form over to the Spanish side whereupon Guevara "scann[ed] the form with his eyes it looked to me like line-by-line." According to the first officer, Guevara "signed the English side first and then the Spanish side I believe." Both officers testified that the blanks on both sides of the form had already been filled in when it was presented to Guevara.

The first officer testified that the officers did not specify in their request a particular part of the car for the search, such as the trunk or glove compartment. The pre-typed portion of the consent form authorizes "a complete search" of the car.

According to the officers' account, after Mrs. Guevara and the remaining children exited the car, the search of the car commenced. While the second officer stayed with the family, the first opened the driver's side door, "popped" the panel and some additional plastic covering, and observed "a bundle of possibly some type of narcotic."

Guevara's and Rodolfo's testimony contradicted that of the officers. Guevara denied that he was asked whether there was anything illegal in the car. He testified that the blanks on the consent-to-search form were not filled in when it was handed to him to sign and that the officers asked only to search the trunk. He testified that he could not read the English-language consent-to-search form, and that he did not ask his son

to translate because he believed it merely authorized a search of the trunk, after which he would be permitted to leave. Guevara's signature appears on both sides of the form. Guevara testified that he signed where the officer pointed, without ever holding the form in his hands. He recognized his signature on the Spanish-language side of the form but did not recall signing that side, noting that the process happened "very fast." He claimed that he did not feel free to leave, but he hoped he would be allowed to if he consented to the search of the trunk.

Rodolfo also testified that the officers stated only that they were going to search the trunk. He denied that the officers asked for or received permission to search the inside of the car. He testified that in response to the officers' request, Guevara agreed to open the trunk, and did so, whereupon it was searched by both officers. One of the officers then went on to search the glove compartment, and then pulled apart the plastic paneling on the driver's door.

After discovering a bundle in the door panel, the officer pointed his gun at Guevara and told him to drop to his knees and put his hands behind his back. Guevara complied and was handcuffed. The children and Mrs. Guevara were directed to the back of a squad car. One of the officers retrieved the package. It tested positive for cocaine.

The first officer then informed Guevara that he was under arrest for possession of cocaine. According to the officers' testimony, both of them recited *Miranda* rights to Guevara—the first in English from memory, and the second in English and then Spanish from a card when Guevara appeared confused. The second officer testified that Guevara shook his head in the affirmative when asked whether he would answer questions. Neither officer made a record that the *Miranda* warnings were given. Guevara denied receiving *Miranda* warnings at his arrest.

The second officer then asked Guevara how much cocaine was in the car. Guevara responded "sixty" in English. Ultimately 60 1–kilogram bricks of cocaine were found secreted within the side panels of the car.

Two additional officers, one a Lieutenant, joined the scene. Upon learning at this time that Mrs. Guevara was a Colombian, Rodolfo testified that the second officer responded, "No wonder." The family and their car were taken to the Memphis Police Department.

Guevara was led to a holding cell at the Organized Crime Unit (OCU) office and left alone. Mrs. Guevara and the children were held in the office while the officers decided whether or not to charge her. Ultimately, they were released.

A volunteer Spanish interpreter, Emily Quintana, who is not on the staff of the Memphis Police Department, was called, together with Officer Stephen Friedlander, who had taken some Spanish in high school and college. Friedlander testified that he is not fluent in Spanish. Detective Richard Borgers, a member of the Memphis Police Department assigned to the DEA task force, testified that he selected Officer Friedlander over Ms. Quintano as the interpreter.

Without first informing Guevara of his *Miranda* rights, Borgers explained to Guevara that he was facing federal charges, that sentencing guidelines would apply if he were to be found guilty at trial, that the judge would have to adhere to the guidelines unless the prosecutor submitted a cooperation letter, and that cooperation had to be "total, complete." Borgers testified that Guevara then indicated that he wanted to cooperate.

According to Borgers, Friedlander then read to Guevara in Spanish his *Miranda* rights from a card supplied by Borgers. Guevara responded that he wanted an attorney and that he wished to cooperate. Borgers told Guevara that he would have to speak to an attorney before going any further.

Borgers offered to assist Guevara in obtaining retained counsel but Guevara said he could not afford one. Borgers then attempted to call an Assistant United States Attorney. When that failed, he spoke with a Shelby County Assistant Attorney General to try to arrange for a court-appointed attorney from the public defender's office. When that also failed, Borgers told Officer Leo Hamp-

ton to fill out the arrest ticket and take Guevara to the Shelby County jail, where he was kept over the weekend.

Hampton was assigned to complete Guevara's paperwork in preparation for bringing him to the Shelby County jail. Before an attorney was supplied, Hampton asked Guevara who had put the cocaine in the car and when he was expecting to arrive in New York, and Guevara responded with various incriminating answers. Hampton provided Guevara with one of his business cards, with a beeper number on it, and "advised him that if he wanted to contact any of us or talk to me that he can ... [page] me ... and we'd come over to him." At the time the statements were elicited, Hampton was aware that Guevara had requested an attorney. Guevara was then taken to the Shelby County jail.

At approximately 8 or 9 p.m. that night, Hampton received a beep on his pager. When he learned that the page number was for the Shelby County jail and that a "Hispanic" wanted to speak to him, he telephoned Borgers. Borgers directed Hampton not to contact Guevara or talk to him, and Hampton complied. Guevara testified that he did attempt to reach Hampton several times, and was given access to a phone, but did not succeed.

Guevara's recollection of these events differs in some respects. For example, in his testimony he referred to two interrogations, with a female interpreting, in addition to his questioning by Hampton. The differences are not material to the suppression motion since the government does not intend to use Guevara's statements made at the OCU.

Guevara and his son both testified that while they were held at the OCU office on the day of the arrest, Guevara was threatened that if he did not cooperate, his wife would be prosecuted and his children would be taken away. According to Guevara, he said he would cooperate if the agents would guarantee that nothing would happen to his family. Guevara testified that, in light of the threats, he felt coerced into cooperating and felt that he had no choice. The government's witnesses denied having made such threats.

Borgers arrived early at his office on Monday to contact Assistant United States Attorney Tim Descenza to arrange for a court-appointed attorney. Descenza told Borgers that attorney April Ferguson would represent Guevara. Ferguson was at that time an Assistant Public Defender who represented federal defendants.

Hampton and the second officer picked up Guevara at the jail on Monday. While at the jail, Hampton encountered David Hayes, of the Immigration and Naturalization Service, who knows some Spanish. Hayes and Hampton discussed the possibility of Hayes' acting as an interpreter later that day if necessary. Hayes conceded that one of the reasons he agreed to translate was to investigate Guevara's immigration status.

Guevara was taken to the United States Attorney's office, ostensibly because there was a public defender available for him to talk with there. Hayes rode with Guevara from the jail to the office. Guevara testified that Hayes told him that if he did not cooperate, his residency card would be taken.

The Memphis United States Attorney's office is in the same building as the federal courthouse. Attorney Ferguson testified that the normal practice would be to bring the defendant before a magistrate judge for appointment of counsel and that on a Monday morning there would be no shortage of magistrates or Spanish interpreters at the courthouse. Ferguson is familiar with this practice because she worked as a federal defender in Memphis from 1987 until November of 1994, when she became a private practitioner.

Borgers explained to Ferguson that Hayes, an agent of the government, would interpret during her meeting with Guevara. According to Borgers, both Guevara and Ferguson were comfortable with, and agreed to, that arrangement. Ferguson spoke with Guevara for a period of time estimated by the various agents to be between five minutes and half an hour. Borgers asserts that the door to the conference room was closed during the meeting.

In her testimony, attorney Ferguson disputed much of Borgers' account of this meet-

ing. She said she agreed to talk to Guevara as a "favor" to Descenza, a friend of hers. She was under the impression, from her conversation with Descenza, that Guevara was making up his mind on whether or not to cooperate. She was unaware that Guevara had requested counsel; had she known, she would have said that he should be taken before a magistrate judge to have counsel appointed. Ferguson was emphatic that she never considered herself Guevara's counsel. She testified that the door to the conference room was open for much, if not all of the meeting, which she estimated lasted 5–10 minutes at most, and that agents entered and exited the room during that period. She testified further that she lacked confidence in Hayes' Spanish-speaking ability, and noted some mistranslation based on her own minimal familiarity with Spanish. Ferguson testified that she told Guevara that he had a right to an attorney and discussed his possible exposure under federal sentencing guidelines. Under cross examination, Ferguson added that she also told Guevara that he could appear in front of a judge. According to Ferguson, Guevara was largely noncommunicative and unresponsive.

Guevara testified that the officers told him, and that he understood, that Ferguson was his lawyer. He said that he understood most of the translation, and that he asked for clarification as needed. Guevara agreed with Ferguson that there was no privacy during the meeting. Guevara testified that he told Ferguson that he was "terrified about the situation my family might be in because I didn't see them."

According to Borgers, Ferguson then "called us back into the room, [and] indicated that [Guevara] did want to cooperate." In her discussion about the guidelines with Guevara, Ferguson was mistaken about the amount of drugs involved, thinking it only to be 6 or 10 kilograms. Borgers corrected her as to the amount and Guevara indicated that he still wanted to cooperate and participate in a controlled delivery. Borgers testified that Hayes then translated a waiver form for Guevara, and Guevara waived his initial appearance before a magistrate judge. He also testified that Ferguson stayed with Guevara until the form was signed, and then excused herself.

Guevara's and Ferguson's testimony conflicted in some respects with that of the law enforcement officials. Guevara denies that the waiver was translated for him, although he testified that Hayes was in the room when it was presented to him and discussed. He testified that he signed the waiver without knowing what it was; to him it was a "contract" or "agreement" that he was told he "had to sign." Guevara testified that Ferguson was not present when the waiver was signed.

Ferguson denies being present for the signing of the waiver; she states she refused to witness the waiver because she did not know if Guevara really understood what he was being asked to do and, additionally, because she was not his lawyer. She testified that she left after declining to witness the waiver, feeling used by the government and useless to Guevara. She had no further contact with Guevara.

The remaining persons then discussed the logistics of the controlled delivery, with Hayes interpreting. They also questioned Guevara about the origin of the cocaine and other aspects about the trip. Guevara mentioned that he was planning to take the drugs to someone named Beto in New York and that he was to page Beto from a hotel in Queens. Beto was supposed to come to the hotel to pick up Guevara's car and remove the drugs. During the conversation, Guevara agreed to a proposed taping of a phone conversation with Beto to be placed from Memphis. The call is described in Part III.A, *infra*.

At some point, Guevara indicated that he did not want to have to testify as part of his cooperation. When the agents told him that he would have to or else forego any cooperation agreement, he agreed to continue cooperating.

When Hayes finished interpreting, he returned to his office and requested Guevara's immigration file.

Guevara and the Cadillac were airlifted to New York. In New York, Guevara was debriefed about his past involvement with the

members of the conspiracy and the plans for the current cocaine delivery, this time by DEA Agent Edwin Bourdon. During the briefing, according to Bourdon, Guevara reiterated his concern for his family's safety. This phase of the investigation is described fully in Part III.A, *infra.*

After the evidentiary hearing in this court in Brooklyn, members of the Memphis Police Department who had testified returned home. They were assured of substantial forfeited assets resulting from their work that would accrue to a Memphis police force fund. *See* Part III.A, *infra* (describing amounts of cash seized at Restrepo's home).

The court finds the defendant, Guevara, his son, Rodolfo, and the attorney, April Ferguson, credible. It finds that the first and second officer at the scene of the stop lied. Where there are material inconsistencies between the three defense witnesses' testimony and that of the government's witnesses, the court credits the defense version. The court also finds that Guevara truthfully described his language ability; the government's argument that he understands English is unsupported. These assessments of credibility are based upon the court's observations of the witnesses and all other factors normally utilized in assessing credibility. *See, e.g.,* 1 Leonard B. Sand, John S. Siffert, Walter P. Loughlin & Steven A. Reiss, *Modern Federal Jury Instructions: Criminal* ¶ 7.01 (1994) ("Witness Credibility").

## B. Which Circuit's Law Applies

A threshold question is what law a district court should apply when a defendant seeks suppression of evidence that derives from alleged federal constitutional violations that occurred in a different circuit. All of the alleged violations of Guevara's rights that form the basis for his suppression motion occurred in the Sixth Circuit, in Tennessee.

While there is little case law discussing the problem of inter-circuit conflicts of law, one case from a district court in this circuit does address the issue. In *United States v. Gerena,* 667 F.Supp. 911, 913 (D.Conn.1987) (Claire, J.), the judge concluded that with respect to challenges to the validity of electronic surveillance, "the governing law should be that of the place where the electronic surveillance occurred." He also concluded that a "lex loci" approach should be applied to the non-surveillance-based suppression motions before him:

> Evidence illegally obtained within the First Circuit, and inadmissible there, must also be inadmissible here regardless of whether this circuit has a less restrictive exclusionary rule. Any contrary position would seriously jeopardize the integrity of the federal courts, and would in fact amount to a subterfuge in violation of undeniable statutory and constitutional values. Conversely, tainted evidence obtained within the First Circuit but nonetheless admissible there should also be admissible here regardless of whether this circuit has a more stringent exclusionary device.... [T]here is no logical basis for the conclusion that the forum should reward or punish the Government with either a more lenient or a more severe penalty than that proclaimed by the courts of the jurisdiction where the conduct occurred.

*Id.* at 926–27 (footnotes omitted).

This approach is sensible. The Memphis officers should have been able to rely on their understanding of the law in the Sixth Circuit and could not have been expected to know the law in circuits other than the one in which they were operating. Consequently, suppression of evidence inadmissible in this circuit but admissible in the Sixth Circuit would not deter misconduct of officers based in Memphis; rather, it would penalize officers' good faith efforts to comply with the law. Correlatively, suppressing evidence in this Circuit based on its illegality in the Sixth Circuit, irrespective of its admissibility in this circuit, makes sense since it ensures that the proper level of deterrence is maintained in the locale where the violation occurred.

■ Where the parties do not raise the conflicts issue, it is appropriate to apply the law of the circuit in which the motion to suppress is made. Both the district and appellate court will be more familiar with that law.

■ While the matter has not been briefed, it appears that the Sixth and Second

Circuit approaches to the critical issues raised by Guevara's treatment are quite similar. Moreover, Supreme Court precedents directly control a number of the issues. In light of the failure to raise the conflicts issue, the applicable law is analyzed according to Second Circuit case law that would apply in this district, with agreement by the Sixth Circuit either noted or assumed.

### C. Validity of Stop and Subsequent Detention

#### 1. Law

■ Three levels of encounters between police and individuals are recognized: consensual encounters which may be initiated without any objective level of suspicion; limited investigative stops which must be supported by a "reasonable articulable suspicion" of criminal activity; and arrests which must be supported by probable cause. *See United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir.1992); *United States v. Hooper*, 935 F.2d 484, 490 (2d Cir.), *cert. denied*, 502 U.S. 1015, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991); *see also United States v. Dotson*, 49 F.3d 227, 230 (6th Cir.1995). Only the last two types are "seizures" within the Fourth Amendment. *Glover*, 957 F.2d at 1008; *Hooper*, 935 F.2d at 490. An extended incident with the police may involve more than one of these types of encounters.

■ A traffic stop " 'constitutes a limited seizure within the meaning of the Fourth and Fourteenth Amendments.' " *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.) (quoting *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir.1993)), *cert. denied*, —— U.S. ——, 115 S.Ct. 207, 130 L.Ed.2d 136 (1994); *see also Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) ("[S]topping an automobile and detaining its occupants constitutes a 'seizure' ... even though the purpose of the stop is limited and the resulting detention quite brief."). A traffic stop must be supported either by " 'probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct.' " *Scopo*, 19 F.3d at 781 (quoting *Hassan El* and citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "Probable cause arises when the police rea-

sonably believe that 'an offense has been or is being committed.' " *Id.* (quoting *United States v. Cruz*, 834 F.2d 47, 50 (2d Cir.1987), *cert. denied*, 484 U.S. 1077, 108 S.Ct. 1056, 98 L.Ed.2d 1018 (1988)). Observation of a traffic violation constitutes probable cause for a stop. *Id.* at 782.

■ A traffic stop which had a valid basis but which in fact was motivated by an officer's desire to investigate an unrelated crime for which no reasonable suspicion exists will be upheld in the Second and Sixth Circuits. *See, e.g., United States v. Thompson*, 29 F.3d 62, 65 (2d Cir.1994); *Scopo*, 19 F.3d at 782 (rejecting "usual police practices" test, which considers whether the violation is of the type normally acted on by officers, in favor of "authorization" test, which considers whether there was a valid basis for the arrest); *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir.1993) ("[T]raffic stops based on probable cause, even if other motivations existed, are not illegal."), *cert. denied*, —— U.S. ——, 115 S.Ct. 97, 130 L.Ed.2d 47 (1994); *see also United States v. Nersesian*, 824 F.2d 1294, 1316 (2d Cir.) ("[A] valid basis for detention and search which exists in the first place ... is not rendered invalid by the fact that police resort to a pretext...."), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987), 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987) & 484 U.S. 1061, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988). Only pretextual stops that lack any proper basis are considered illegal under the two circuits' approach.

■ A traffic stop based on an observed violation may be extended into a more intrusive investigatory detention if the officer detains the driver beyond what is necessary to achieve a resolution of the traffic-related reasons for the initial stop. An investigatory detention must satisfy two grounds. First, it must be "justified at its inception ... and ... [second, it must be] reasonably related in scope to the circumstances which justified the intervention in the first place." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *see also United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985).

■ For an investigatory detention to be justified at its inception, the officer must be able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrants that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880; *see also Glover,* 957 F.2d at 1008 (limited investigative stop must be based on " 'a reasonable suspicion supported by articulable facts' "). Detention, absent an articulable and reasonable suspicion of criminal conduct, including a traffic offense, violates the Fourth Amendment.

■ The second factor is whether the scope and duration of the detention is appropriate given its basis. *See Glover,* 957 F.2d at 1011. The detention must be "temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983); *see also Sharpe,* 470 U.S. at 685, 105 S.Ct. at 1575. Whether the police "acted less than diligently, or. . . . *unnecessarily* prolonged [a suspect's] detention" are factors to be considered. *See Sharpe,* 470 U.S. at 685, 105 S.Ct. at 1575 (emphasis in original).

Courts of appeals in other circuits have considered what constitutes the appropriate scope of the stop of a vehicle for an actual or suspected traffic violation. In *United States v. Guzman,* 864 F.2d 1512, 1519 (10th Cir. 1988) (citations omitted), the court explained that once a routine traffic stop is completed, the vehicle and its occupants cannot be detained further for questioning or other purposes:

> An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.

The facts in *Guzman* were similar to those of the instant case. The defendant and his wife, apparently of Hispanic ethnicity, were stopped on an interstate highway in New Mexico while driving a Cadillac bearing out-of-state plates, purportedly for a suspected violation of the state's seatbelt law. Even after the officer had obtained all of the information relevant to the supposed violation, he continued to question the defendant and obtained defendant's signature on a consent-to-search form. A search of the car revealed drugs and hidden cash. The court of appeals found that the stop was unconstitutionally pretextual. *Id.* at 1515–18.

The court of appeals also accepted the district court's conclusion that "even if the initial stop was not illegal, the subsequent detention was excessively intrusive," given the absence of objective factors justifying a further intrusion. *Id.* at 1519; *see also United States v. Ramos,* 20 F.3d 348, 352 (8th Cir.) ("idle chit chat" during issuance of warning for seatbelt violation was intrusion "wholly unrelated to purpose of the initial stop" and not justified under *Terry* ), *rev'd in part on reh. on other grounds,* 42 F.3d 1160, 1163 (8th Cir.1994); *United States v. Cupps,* 503 F.2d 277 (6th Cir.1974) (police lacked authority to order defendant out of car after he presented a valid driver's license); *United States v. Garnier,* No.93–5925, 1994 WL 362085 (6th Cir. July 12, 1994) (unpublished) (once officer resolved that driver was not intoxicated or carrying dangerous weapons, request to search trunk was unjustified further intrusion); *cf. People v. Banks,* 85 N.Y.2d 558, 626 N.Y.S.2d 986, 650 N.E.2d 833 (1995) (detention of defendant beyond time needed to resolve initial basis for stop in order to effectuate a search of the car with another officer's assistance was grounds for suppression).

■ Detention beyond the time required to resolve the initial observed or suspected violation is only permitted where observations amounting to an articulable and reasonable suspicion justify a further intrusion. For example, "[i]f reasonably related questions raised inconsistent answers, or if the licenses and registration do not check out, a trooper's suspicions may be raised so as to enable him to expand the scope of the stop and ask additional, more intrusive, questions." *Ramos,* 42 F.3d at 1163; *see also United States v. Barahona,* 990 F.2d 412, 416 (8th Cir.1993) ("[I]f the responses of the detainee and the circumstances give rise to

suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions."); *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir.1993) ("If the officer wishes to detain the driver for further questioning unrelated to the initial stop, the officer must have an objectively reasonable articulable suspicion that illegal activity has occurred or is occurring." (citing *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir.1990), *cert. denied*, 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991))).

### 2. Application of Law to Facts
#### a. Stop

■ The stop violated the Fourth Amendment. It lacked a proper basis. Guevara was not speeding or violating any other traffic ordinance. During the suppression hearing, the court stated its tentative conclusion, based solely on Rodolfo's and the first officer's testimony, that there appeared to be a basis for the stop, either speeding or following too closely. With the benefit of Guevara's testimony and the full briefing supplied by the parties, on reflection, the court finds that no traffic violation occurred.

Guevara was stopped and questioned solely because he was driving a car with out-of-state license plates and appeared to be Hispanic. This practice is apparently not uncommon. *See, e.g., Whitfield v. Bd. of Cty. Comm'rs*, 837 F.Supp. 338, 340–44 (D.Colo. 1993) (highway drug interception program in which vehicles were stopped on the basis of their out-of-state licenses and the race of the occupants, among other factors); *Illegal Searches Used in Illinois, Suit Alleges*, N.Y. Times, Sept. 4, 1994, at A24 (ACLU brings suit challenging Illinois state troopers' alleged practice of stopping black and Hispanic drivers for drug searches); *cf. Jones v. United States Drug Enforcement Admin.*, 819 F.Supp. 698, 711–14 (M.D.Tenn.1993) (minorities targeted in drug interdiction program at Nashville airport).

The court is troubled by, although its holding does not rely on, the existence of powerful incentives under the civil forfeiture statute, *see* 21 U.S.C. § 881(a)(6), for police to create nonexistent violations, or to trump up minor violations, to support searches that may lead to forfeitures of assets for their departments. *See, e.g.,* David Heilbroner, *The Law Goes on a Treasure Hunt,* N.Y. Times Mag., Dec. 11, 1994, at 70 (description of how one locality benefitted from approximately five million dollars confiscated through highway stops that were transformed into drug searches). Under the civil forfeiture statute, police departments can seize and retain any property that could "facilitate" a narcotics crime. 21 U.S.C. § 881(a)(6); *see, e.g., Jones,* 819 F.Supp. at 724 (discussing the potential for abuse and corruption in one forfeiture scheme, and characterizing such schemes as "an unsavory and embarrassing scar on the administration of justice"); *cf. Tumey v. Ohio,* 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927) (finding due process violation where mayor, acting as judicial officer, had "direct pecuniary interest in convicting" defendants under statute that allocated portion of fines to repayment of mayor's fees and costs, above his regular salary). Testimony at the suppression hearing established that the officers involved in this particular seizure were aware of the forfeiture provisions and how the Memphis Police Department might benefit when they stopped Guevara's automobile.

#### b. Further Detention

Because the first officer lacked probable cause to stop the car in the absence of a bona fide traffic violation, no analysis of the scope or duration of the stop is required. Since it is possible that the court of appeals will reject this court's determination concerning the respective credibility of the witnesses despite this court's opportunity to observe them, further analysis is required. *Compare United States v. Montilla,* 928 F.2d 583, 586 (2d Cir.1991) ("The district court's credibility findings ... are binding upon us....") *with Whaley v. Rodriguez,* 840 F.2d 1046, 1050 (2d Cir.) ("[W]e are not bound to accept the district court's findings of basic historical fact, if they are clearly erroneous."), *cert. denied,* 488 U.S. 944, 109 S.Ct. 371, 102 L.Ed.2d 360 (1988). What follows is a discussion of whether further detention of the Guevaras was justified, assuming *arguendo* that the stop was, in fact, for a traffic violation.

One can imagine a situation in which an officer issuing a warning or ticket in connection with a routine traffic stop observes something that creates a reasonable suspicion of additional wrongdoing. In that hypothetical situation, an officer would be justified in detaining a suspect as necessary to dispel or resolve his or her concerns.

 That was not the case here. Under an objective evaluation of the facts known to and observations made by the first officer at the time of the stop and as it progressed, except for the invidious ones of ethnicity and out-of-state vehicle registration, it is apparent that he lacked a reasonable articulable suspicion of wrongdoing necessary to continue holding the Guevaras beyond the issuance of the warning.

The first officer was determined to elicit something incriminating from the Guevaras from the moment that he saw their car. He radioed for the second officer almost the moment that the stop was made. Faced with a person who spoke little or no English, the first officer sought to exploit the inherent coerciveness of the stop; he admitted that the general purpose of the kind of questioning he engaged in is to elicit information about wrongdoing unconnected with traffic stops. The stopping officer stalled in issuing the warning to assure that the Guevaras would still be present when a back-up officer arrived. His hope was to elicit incriminating statements which would justify a further detention and a search. Unnecessarily prolonging a traffic stop for the purpose of eliciting information about a suspected unconnected violation for which there is no objective basis is not acceptable.

The first officer's observations of the nervousness of the Guevaras and the supposed inconsistencies in their stories could not support an investigative detention—certainly beyond the point at which the second officer pulled up—for three reasons.

First, it is apparent that the first officer's questioning of Guevara exceeded the scope of what is justifiable for a routine traffic stop. He did not limit his questions to requests for Guevara's driver's license and registration, or even to the nature and purpose of his trip. The questioning extended to issues unrelated to the alleged traffic offense of speeding. For example, he apparently inquired into Guevara's country of origin, just as the second officer later noted that of Mrs. Guevara.

Second, the first officer's testimony about the Guevaras' nervousness and the perceived inconsistencies in their stories is not credited. Courts must guard against the kind of ex post justifications for actions such as were created here.

Third, the first officer's perceptions of Guevara's nervousness and Mrs. Guevara's neck craning, even if true, were insufficient to create a "reasonable articulable suspicion" that criminal activity was afoot. While courts should not lightly second guess the on-the-spot observations of police officers trained to detect wrongdoing, scrutiny of the factors supporting the reasonableness of the officer's suspicions—in this case the perceived nervousness and the neck craning—is required by constitutional jurisprudence. Nervousness of out-of-state non-English speaking parents with small children in a car at a traffic stop on a main highway is something that can be commonly expected even where there is nothing to hide.

The "discrepancies" in the answers supplied by Mr. and Mrs. Guevara could not be relied upon to justify the duration and scope of the detention. The questioning of Mrs. Guevara occurred far into the detention—when its proper scope had already been exceeded—so any "discrepancies" could not be used as a justification for extending the stop. In any event, the Guevaras' statements on the destination and purpose of the trip were similar. The difference between "three days" and a "week" is easily explained by different approaches to inclusion of travel time.

The second officer's testimony, while ostensibly corroborating the first, is not helpful to the prosecution. Based on the court's observations, his testimony also lacked credibility. In addition, the second officer pulled up after the detention had already exceeded its appropriate scope.

The Sixth Circuit court of appeals had it exactly right when it declared:

To condone the actions of the police in this case would unnecessarily *extend the permissible boundaries of investigative detentions.* More ominously, such a decision would relay the message that any routine traffic stop can, even without probable cause of a further violation, be followed by an inherently coercive request to conduct a search of the detained vehicle.

*United States v. Garnier*, 1994 WL 362085, at *2 (6th Cir. July 12, 1994).

### D. Search

#### 1. Law

■ When the government relies on consent to justify the lawfulness of a search, it bears the burden of demonstrating that the consent was given voluntarily. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973) (citing *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968) and other cases); *United States v. Arango–Correa*, 851 F.2d 54, 57 (2d Cir. 1988). The voluntariness of consent is a question of fact that is determined from the totality of the circumstances. *Schneckloth*, 412 U.S. at 227, 232–33, 93 S.Ct. at 2050–51. Consent that is coerced, either by explicit or implicit means, does not pass constitutional muster. *Id.* at 228, 93 S.Ct. at 2048. In deciding whether consent was voluntarily given, courts must balance two competing concerns—the legitimate needs of law enforcement, and the "equally important requirement of assuring the absence of coercion." *Id.* at 227, 93 S.Ct. at 2048.

An "illegal investigative stop invalidates consent unless the government bears its burden of showing that the taint of the illegal stop had dissipated before the consent was given." *United States v. Mire*, 851 F.Supp. 96, 105 (W.D.N.Y.1994) (citing *United States v. Montilla*, 928 F.2d 583, 590 n. 3 (2d Cir. 1991)), *rev'd on other grounds*, 51 F.3d 349 (2d Cir.1995); *see also United States v. Ceballos*, 812 F.2d 42, 49–50 (2d Cir.1987); *United States v. Richardson*, 949 F.2d 851, 858 (6th Cir.1991) ("If consent is given after an illegal seizure, that prior illegality taints the consent to search.").

■ Four factors are considered in determining whether the effect of a tainted stop has sufficiently dissipated: "[1] whether a *Miranda* warning was given, [2] the temporal proximity of the stop and the consents, [3] the presence of intervening circumstances, and [4] the purpose and flagrancy of the illegal stop." *United States v. Montilla*, 928 F.2d 583, 590 n. 3 (2d Cir.1991); *see also Ceballos*, 812 F.2d at 50 (describing four factors); *Richardson*, 949 F.2d at 858–59 (applying factors to find that "consent was not sufficiently attenuated from illegal seizure"); *United States v. Garnier*, 1994 WL 362085, at *2 (6th Cir. July 12, 1994) (applying four factors to invalidate search based on consent in the context of a traffic stop). These four factors are derived from *Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975). They are applied in this and other circuits to determine whether evidence obtained as a result of a constitutional violation should be suppressed as an illegal fruit. *See* Part II.E.1, *infra.*

■ Where consent is voluntarily given, the scope of the search must not exceed that of the consent. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991). "The scope of the search is generally defined by its expressed object." *Id.* In other words, if the officer states that he is searching for drugs, then the search is reasonably understood to include containers in the car that might contain drugs. *See id.* Where the suspect is not informed of the purpose of the search, the test is "[w]hat meaning . . . a reasonable person [would] attach to the word 'search.'" *United States v. Snow*, 44 F.3d 133, 135 (2d Cir.1995).

■ A general or specific consent is not implied to include permission to do physical damage as in breaking something open. *See, e.g., Jimeno*, 500 U.S. at 251–52, 111 S.Ct. at 1804 (consent to search trunk for drugs is reasonably understood to permit opening of paper bag, but probably not "breaking open

of locked briefcase within the trunk"); *United States v. Patacchia,* 602 F.2d 218, 219 (9th Cir.) (consent to search did not authorize officers to pry open car trunk), *amended,* 610 F.2d 648 (9th Cir.1979); *United States v. Washington,* 739 F.Supp. 546, 550 (D.Or. 1990) (consent given to search trunk did not authorize removal of car seats to conduct search when proper key could not be located); *State v. Arroyo–Sotelo,* 131 Or.App. 290, 884 P.2d 901, 905 (1994) (broad consent given by defendant to search for narcotics and cash did not authorize officers to remove screws and pry panel from sidewall of car). In *Arroyo–Sotelo,* the Oregon court of appeals asserted that "a general consent to search a car does not authorize an officer to search areas of a car that are not designed to be routinely opened or accessed." 884 P.2d at 905.

The Second Circuit court of appeals held, in *United States v. Snow,* 44 F.3d 133 (2d Cir.1995), that a general consent to search a car was reasonably understood to apply to an unlocked duffel and paper bags and other closed containers. It "expressed no view on whether [the defendant's] consent would have extended to items like locked briefcases." *Id.* at 135.

■ A search predicated on consent "may be expanded beyond the scope of the consent when it yields a basis for a reasonable articulable suspicion that additional contraband may be found in parts of the car not included in the consent." *United States v. Casares–Cardenas,* 14 F.3d 1283, 1286 (8th Cir.) (drugs found in part of car where search consented to (trunk) justified expanding the search to other parts of car), *cert. denied,* —— U.S. ——, 115 S.Ct. 147, 130 L.Ed.2d 86 (1994). For example, in *United States v. Mire,* 51 F.3d 349, 352 (2d Cir.1995), the court held that the suspect's general consent to a search of his bag was "broad enough to include the finding of drugs in the oversized sole of [one of] the sneakers." The officers cut open the sneaker after noticing that its sole was one inch thicker than that of its mate. *Mire* is thus consistent with the case law that officers may broaden a search predicated on consent—and apply intrusive search procedures beyond what a consenter

might otherwise have objectively and reasonably expected—where they develop an objective basis for believing that contraband exists outside of the area covered by the consent.

### 2. Application of Law to Facts

■ Applying the four-factor test that governs taint dissipation, it is apparent that the taint of the illegal stop had not dissipated.

First, no *Miranda* or other warnings were given before the consent to search was requested.

Second, there was no time lapse. Guevara's "consent" to the search occurred during, and as a direct consequence of, an illegal detention.

Third, there were no intervening circumstances. The traffic stop was designed to manipulate this motorist into granting consent to search.

Fourth, the purpose was illegal and the stop and delay of these interstate travellers was flagrant. Defendant had the full attention of two law enforcement officials, who had detained him beyond what would reasonably be expected for a trumped-up traffic violation. His family was, in some sense, being held hostage to the officers' ethnically-based hunches that illegality was afoot. The length of detention was excessive. No reasonable person would have understood that he was free to leave. That the officers' manipulation of the tension inherent in the situation was successful cuts against, not for, the stop's lawfulness.

The written consent form is inconsequential under the circumstances. Guevara signed it without comprehending what it said about the scope of the search or his right to refuse. His testimony that he felt he had no choice but to sign if he was to be permitted to leave is credible and supported by the evidence.

Were Guevara's consent to be considered valid, and the scope of the stop upheld, the court would have to conclude that the scope of the search was proper. At the time the officers began their search of the car, they were aware of the heaviness of the driver's

side door. (They became aware of that heaviness illegally. The stop had already exceeded its appropriate duration, and there was no reason to open the door in order to question Mrs. Guevara.) Under *Mire,* if they had properly stopped and held the defendant, and if they had properly opened the door to question Mrs. Guevara, they would have been entitled to rely on the observation of the door by "feel" rather than by "sight." The observation would then have been a basis for expanding the search beyond the trunk, and beyond the scope of a general consent to search the car. It would, under *Mire,* then have been appropriate to remove the side panel to investigate the door's interior.

■ The conclusions about the illegality of this stop, the illegal length and nature of the detention, and the lack of freely given consent to the search are dispositive. The police were not justified in opening the car door to converse with a passenger, Mrs. Guevara; therefore, they were not entitled to rely on the door's heaviness to expand their search beyond the consent to search the trunk, or beyond a general consent, to search behind the door panel. *Cf. United States v. Cupps,* 503 F.2d 277 (6th Cir.1974) (gun seen only after defendant illegally ordered out of car ordered suppressed).

E. Suppression as "Fruits of Poisonous Tree"

Guevara seeks suppression as "fruits of a poisonous tree" of his admissions elicited and evidence found as a consequence of the illegal stop. The evidence includes the sixty kilograms of cocaine found in his car. The admissions include his statement in response to police questioning at the scene of the stop that there were "sixty" kilograms of cocaine in the car, his statements to law enforcement officials at the Monday conference at the United States Attorney's office following his meeting with April Ferguson, his purported attorney, and comments made to Agent Bourdon at the New York debriefing. The government is not seeking to introduce his statements at the Memphis Police Department office, presumably because it concedes that their suppression is required as the product of an interrogation of a defendant in custody who has invoked his right to consult with an attorney. For reasons discussed below, each of the statements and the physical evidence must be suppressed as to Guevara as the fruit of a poisonous tree.

1. Law

· ■ Evidence derivative of a constitutional violation must be suppressed as the "fruit of a poisonous tree," unless the taint of the constitutional violation has dissipated. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The government bears the burden of proving attenuation. *United States v. Ceballos,* 812 F.2d 42, 50 (2d Cir.1987) (citing *Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975)). In determining whether the taint of a constitutional violation is sufficiently separated from the evidence sought to be introduced, courts consider the same four factors previously discussed in the context of determining the validity of consent following an illegal stop: whether a *Miranda* warning was given; the temporal proximity of the detention and any statements; the presence of intervening circumstances; and the purpose and flagrancy of the illegal arrest. *See* Part II.D.1, *supra.*

■ With respect to statements following an arrest, *Miranda* warnings by themselves are insufficient to attenuate the taint of an unconstitutional arrest. *See Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (adopting a case-by-case analysis in favor of a per se rule); *United States v. Pena,* 961 F.2d 333, 338 (2d Cir.1992). Where a confession follows an illegal search, "it is even more apparent ... that giving the *Miranda* warnings will not break the causal chain, for these warnings 'do not advise [the defendant] whether the evidence he is confronted with is unlawfully obtained or whether it will be admissible at trial.'" 1 Waye R. LaFave & Jerold H. Israel, *Criminal Procedure* § 9.4, at 747 (1984) (quoting *People v. Johnson,* 70 Cal.2d 541, 75 Cal.Rptr. 401, 450 P.2d 865 (1969)).

■ In analyzing the effectiveness of a reading of the *Miranda* rights to dispel the inherent coerciveness of a custodial interro-

gation, it is the substance rather than the form of the rights read that is important. The court "must ascertain if [the defendant] had his *Miranda* rights brought home to him in an intelligible fashion." *United States v. Anderson*, 929 F.2d 96, 98 (2d Cir.1991).

■ Consultation with counsel is sometimes considered an "intervening circumstance" which may dissipate taint. *See, e.g., United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1300 (9th Cir.1988). Yet, if the statement or other incriminating evidence arises from "exploitation of the illegal[ity]," suppression may still be warranted. 1 LaFave & Israel, *supra*, § 9.4, at 746.

### 2. Application of Law to Facts

■ The cocaine must be suppressed, with respect to Guevara, as a fruit of the illegal stop, detention and search. It is the direct product of a string of egregious Fourth Amendment violations. No intervening circumstance or other indication of attenuation is present to justify its production.

■ Guevara's statement at the scene of the stop that there were sixty kilograms in the car must also be suppressed. Guevara asserts that he did not receive *Miranda* warnings; while the officers' testimony is otherwise, it is disregarded as not credible. Given that Guevara's statement was a direct product of the exploitation of the illegality, *Miranda* warnings would not, in any event, have dissipated the taint.

■ Guevara's statements at the Memphis United States Attorney's office must also be suppressed as the fruit of a Fourth Amendment violation whose taint had not dissipated. At the time that Guevara made the statements, he had been in custody for an entire weekend, isolated from his family, and without the opportunity to consult with a lawyer who could assist him in understanding his rights and preparing his defense. His decision to cooperate was coerced by law enforcement officials who took advantage of his vulnerability as an alien and as a caring father and husband seeking to avoid harm to his children and the arrest and detention of his wife. Law enforcement officials may not exploit such vulnerabilities in their efforts to

advance law enforcement purposes. The fact that *Miranda* warnings were apparently provided on Saturday does not immunize his Monday statements from the taint of the cumulative series of illegalities, particularly since he had asked for an attorney before speaking to the officers who had him in custody. Moreover, it is unlikely that, under the facts of the case, the type of cursory reading the officers say they provided at different points would have "brought home" those rights to Guevara. For similar reasons, statements made to DEA Agent Bourdon in New York are also suppressed.

The government apparently believes that Guevara's communication with attorney April Ferguson was an "intervening circumstance" which dissipates the taint of the illegality. Under the circumstances, Ferguson's contact with the defendant did not break the chain of illegalities. Ferguson did not believe herself to be Guevara's attorney; she misunderstood the purpose for which she was to meet him and thus was unable to properly fulfill the attorney's role. Her short communication with Guevara, hampered by difficulties with translating and a lack of privacy, was insufficient either to inform her properly of the amount of drugs and circumstances of Guevara's crime or to inform him of his rights. The presence of an INS agent with a possible independent ground for prosecuting Guevara was particularly telling. Rather than protecting defendant's right to counsel, the government tricked him into giving up his right to an appearance before a magistrate judge to whom he should have been promptly taken.

The fact that Guevara testified that he understood Ferguson is not helpful to the prosecution. At that point, he did not know what it meant to have a lawyer working on his behalf and assisting him with an understanding of his legal rights—and particularly of the illegal nature of the stop. Nor did he have any idea about what his rights might be and how to protect them against a waiver. Rather then attenuating the taint, the meeting compounded it. It was conducted by a lawyer who was not acting as his attorney, who had been hand-picked by an Assistant United States Attorney to avoid having an

attorney appointed by an available magistrate judge, and who was using an inadequate translator selected by the police, whose interests as an INS agent were adverse to Guevara's. The meeting was designed to ensure that Guevara would be a pliant tool of the government, not to protect his constitutional rights.

■ While the fruits of the unconstitutional stop are suppressed as to Guevara, they are not subject to suppression as fruits as to his codefendants, Caro and Restrepo. The seizure of the cocaine and the other fruits of the illegal stop "invaded no right of privacy of person or premises which would entitle [the codefendants'] to object to its use at [their] trial." *Wong Sun v. United States*, 371 U.S. 471, 492, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963); *see also Alderman v. United States*, 394 U.S. 165, 169–76, 89 S.Ct. 961, 964–68, 22 L.Ed.2d 176 (1969) (codefendants lacked standing to object to government's use of fruits of illegal surveillance).

## III. CARO'S AND RESTREPO'S MOTIONS TO SUPPRESS

### A. Facts

The witnesses are largely in agreement about the events implicated directly in Caro's and Restrepo's motions. After the meeting at the United States Attorney's office in Memphis on Monday, Guevara was taken to a motel to arrange a call to the New York-based conspirators. The defendant and the detectives paged someone in New York who later turned out to be Caro (also known as "Beto"). Caro called Guevara a few minutes later and was informed that there was some car trouble and that the arrival would be the next day. According to Guevara, he was permitted to visit with his family for few minutes after the call was completed.

No electronic surveillance warrant was issued for this telephone call. The law enforcement officials testified that the call was recorded using an ear bug. Guevara testified that he did not recollect an ear bug, but that he did see a small recorder and knew that the call was being taped. Several detectives were in the room at the time that the

call was made. Hayes again acted as an interpreter.

Guevara and some of the Memphis-based officers, and the INS' Hayes, flew to New York with the Cadillac. There they were joined by New York-based DEA agents. The agents set up videotape and audiotape equipment at two rented rooms at the LaGuardia Airport Marriott Hotel in preparation for Guevara's meeting with Caro. The recording equipment was visible to Guevara. Bourdon testified that Guevara stated that he was willing to participate in the taping.

Guevara beeped Caro from the hotel. Caro called the hotel in response, and his call was recorded. Following the telephone call, Caro came to Guevara's hotel room. There, the two discussed various aspects of the cocaine delivery. Caro told Guevara that he wanted to leave the hotel to obtain New York license plates and cash for Guevara, and that he would return later. He explained that New York plates would be less likely to draw police attention than Guevara's California plates. Caro asked where Guevara's car was, with the cocaine, and Guevara drew a map. Caro said that he would return at night, following the Mets game, when there would be fewer police. Due to either an equipment malfunction or human error, the video machine failed to record this first meeting between Guevara and Caro. Bourdon, however, monitored the conversation and included a description in a DEA report.

Caro left but then returned shortly thereafter, without the license plates or the cash. He told Guevara that they should do a dry run in Caro's car to ensure that Guevara knew where the drugs would be unloaded. Caro drew a map from the hotel purportedly to the house where the cocaine would be unloaded. The map that Caro drew does not identify Restrepo's house precisely, but notes locations on the opposite side of Queens Boulevard from where his house is located. After the dry run, the plan was to return to the hotel for Guevara to retrieve his Cadillac for the delivery.

The agents followed Caro and Guevara in Caro's car. At some point during the surveillance, the agents briefly lost sight of them. Caro and Guevara were stopped, and

Caro arrested, when the car reappeared several blocks from Restrepo's house.

Guevara told the detectives that Caro had pointed out the house and a particular driveway, although he had not given the address, and that Caro had explained that the cocaine was to unloaded into a "basement." Guevara also told the detectives that he could locate the house, and he did so when brought back to the place where Caro had driven previously.

Restrepo's house shares a common landing with an attached residence. When the agents arrived at Restrepo's house, DEA Agent Steven Monaco walked around its perimeter and noted that the first and basement levels of the house had direct access to a fenced-in backyard adjacent to a driveway. Agent Monaco and another agent noticed a light go on in the first level, and "shadows moving about" inside.

DEA Agent Kiernan observed a man, later identified as Restrepo, come out of the front door and step onto the landing. Kiernan identified himself to Restrepo, apparently while standing on the sidewalk. Restrepo attempted to reenter his house and Kiernan directed him to stop. When Restrepo continued to move to his door, Kiernan traversed part of the sidewalk and the steps of Restrepo's stoop and stopped him by placing his hand on Restrepo's arm.

Monaco and Kiernan then led Restrepo to the sidewalk. DEA agents immediately conducted a "security sweep" of the interior of the house.

While the sweep was being conducted, agent Bourdon questioned Restrepo about whether he lived in the house and whether there were any guns in it. Restrepo responded to Bourdon's questions and stated that no weapons were in the house. During the sweep, the agents found a set of New York license plates, in "plain view," in a closet. They did not locate any weapons or anything else of an incriminating nature at that time. Once the sweep was completed, Bourdon entered the house with Restrepo.

In the house, the agents asked Restrepo for his identification. Restrepo took out his wallet, but then put it back in his pocket before the agents could actually see its contents. The agents asked again to see some identification, and as Restrepo held his wallet, the agents saw him attempting to hide paper in his underwear.

The agents told Restrepo that he was under arrest, frisked him for weapons and handcuffed him. Bourdon then read Restrepo his *Miranda* rights, using a card that contained both English and Spanish versions. According to Bourdon, Restrepo stated that he would answer questions. He told the agents that one of the cars outside the house was his own. During the questioning, an agent said something that upset Restrepo, whereupon Restrepo stated that he would not answer any more questions and that he wanted an attorney. Restrepo would not consent to a further search of the house.

The wallet was placed on the dining room table, together with a beeper that was found during the frisk. An agent noticed that one of the numbers in the beeper was Caro's, and that a call had been made at 5:37 p.m. that day.

Restrepo was taken to the New York field division for processing at 9 p.m. At about 11 p.m., Restrepo's girlfriend and roommate arrived at the house. Neither would consent to a search of the house.

At 11:45 p.m., the detectives called an Assistant United States Attorney to obtain a warrant to search the house. The warrant was issued at approximately 1:15 a.m.

Following issuance of the warrant, a more thorough search was conducted. It resulted in a seizure of approximately $130,000 in cash and a photograph appearing to depict Caro.

### B. Caro's Motion

Caro moves to suppress the taped conversations between himself and Guevara on the grounds that they were obtained in violation of 18 U.S.C. § 2515. Under the statutory scheme, interception of wire or oral communications is permitted only where one participant has consented or by judicial authorization. Caro asserts that since Guevara's consent to the recordings was not given voluntarily, it does not satisfy the statutory requirement.

#### 1. Law

Under federal statutory law, the contents and fruits of illegal recordings of electronic conversations must be suppressed:

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence ... if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2515. Any person who is "aggrieved" may seek to have the material suppressed:

Any aggrieved person ... may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—

(i) the communication was unlawfully intercepted ...

*Id.* § 2518(10)(a). The term "aggrieved person" is to be construed "in accordance with existent standing rules." *Alderman v. United States,* 394 U.S. 165, 175 n. 9, 89 S.Ct. 961, 968 n. 9, 22 L.Ed.2d 176 (1969).

An interception with the consent of one of the conversants is not illegal.

It shall not be unlawful ... for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

18 U.S.C. § 2511(2)(c); *see also id.* § 2511(2)(d) (similar provision governing interceptions by persons not acting under color of law).

### a. Standing to Challenge Validity of Consent

■ The government contends that Caro does not have standing to challenge Guevara's consent. It is wrong.

Courts routinely examine the voluntariness of any consent given by government informers to interception of telecommunications in suppression motions filed by the defendants against whom the evidence obtained in the intercepted conversations is to be used. *See, e.g., United States v. Bonanno,* 487 F.2d 654 (2d Cir.1973); *United States v. Antoon,* 933 F.2d 200 (3d Cir.), *cert. denied,* 502 U.S. 907, 112 S.Ct. 300, 116 L.Ed.2d 243 (1991); *United States v. Axselle,* 604 F.2d 1330 (10th Cir.1979); *United States v. Horton,* 601 F.2d

319 (7th Cir.), *cert. denied,* 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979); *Cooper v. United States,* 594 F.2d 12 (4th Cir.1979). Denial of suppression motions in these cases rested not on the defendants' lack of standing but on findings by the court of voluntary consent by another party.

The government cites *United States v. Ruggiero,* 928 F.2d 1289, 1303 (2d Cir.), *cert. denied,* 502 U.S. 938, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991), for the proposition that the wiretap statutes are " 'to be construed in accordance with standing requirements usually applied to suppression claims under the fourth amendment.' " *Ruggiero* is not controlling on the facts of the instant case. The wiretap in *Ruggiero* was not predicated on the presence of one party's consent, but rather on judicial authorization. In the instant case, the legality of the surveillance is predicated on the basis of one of the conversant's consent.

Caro's own rights under the statute were directly implicated. As a conversant, Caro's claim does not rest on a violation of Guevara's rights, but instead is "personal" to him. *See Alderman v. United States,* 394 U.S. 165, 174–75, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969). If his conversations with Guevara were taped in violation of the statute, Caro would be an "aggrieved person." *See* 18 U.S.C. § 2518(10)(a); *see also, e.g., United States v. Ransom,* 515 F.2d 885, 889–90 (5th Cir.1975) (holding that defendant who sought to challenge admissibility of transcripts of phone conversation on basis of codefendant's lack of consent, which was disputed in the case, had standing since he was a conversant; codefendant who was not a party to the conversation lacked standing), *cert. denied,* 424 U.S. 944, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976).

### b. Validity of Consent

■ The fact that consent is involuntary for one purpose or as to one party does not necessarily render it invalid as to another. *See, e.g., United States v. Bonanno,* 487 F.2d 654, 658 (2d Cir.1973) ("[T]he extent of proof required to show that an informer consented to the monitoring or recording of a telephone call is normally quite different from that needed to show consent to a physical search."); *United States v. Horton,* 601 F.2d

319, 321–22 (7th Cir.) (adopting *Bonanno* ), *cert. denied,* 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979). In *Bonanno,* the informer on whose consent for taping the government relied refused to testify regarding his consent, from fear both of self-incrimination and retaliation from the defendant. Since "[a]n informer's consent to monitoring or recording of a telephone conversation is an incident to a course of cooperation ... [which] entails no unpleasant consequences to him," the court of appeals held that "it will normally suffice for the Government to show that the informer went ahead with a call after knowing what the law enforcement officers were about." 487 F.2d at 658–59.

The fact that the consent is ruled invalid with respect to one defendant does not mean that it will necessarily be invalid with respect to others. While courts in the Second Circuit have not squarely addressed this problem, at least one federal appellate court has. In *United States v. Jones,* 839 F.2d 1041, 1051 (5th Cir.), *cert. denied,* 486 U.S. 1024, 108 S.Ct. 1999, 100 L.Ed.2d 230 (1988), tapes obtained pursuant to a wiretap were suppressed as to the defendant on whose consent the government relied, but admitted as to the other defendants. The court reasoned that the basis of the suppression—violation of the "consenting" defendant's Sixth Amendment right to counsel—did not require a determination that the consent was not voluntary with respect to the tape's admissibility under the statute against codefendants:

> The fact that Norman did not have the benefit of counsel before deciding to make the call does not vitiate his consent for the purposes of the wiretap statute, even though the trial court ruled that Norman's lack of counsel made the conversations inadmissible as to Norman himself. The trial court ruled that use of the tape recordings against Norman would have violated his sixth amendment right to be represented by an attorney.... The same reasoning, however, does not support exclusion of the evidence under the wiretap statute. The interest in privacy protected by the statute is more narrow than the panoply of legal rights vindicated through a defendant's access to counsel. The privacy interest may be waived even though

the broader protection of counsel has not been provided. To hold that a conversant's consent is not voluntary unless he had legal counsel would be to assign the wiretap statute a supervisory purpose for which it was never intended.

*Id.* (citation omitted). Nor did the fact that the defendant who provided the consent was induced to do so by the prospect of leniency or the prosecution's overstatement of the possible sentence vitiate the validity of the consent with respect to his codefendants. *Id.* at 1050–51.

Different degrees of coercion can exist at different times. The fact that a defendant's agreement to cooperate is coerced does not mean that the defendant's additional consents to do things as part of that cooperation are equally coerced for purposes of determining the rights of others. *Cf. Bonanno,* 487 F.2d at 658 (informer's consent to the monitoring or recording characterized as *"incident* to a course of cooperation") (emphasis added); *Horton,* 601 F.2d at 323 (similar).

■■■ The police are normally sufficiently deterred from illegal conduct by suppressing evidence intended to be used against the person whose rights are being violated. *Cf. Alderman,* 394 U.S. at 174–75, 89 S.Ct. at 967 ("[W]e are not convinced that the additional benefits of extending the exclusionary rule to *other defendants* would justify further encroachment upon the public interest in prosecuting those accused of a crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth.") (emphasis added). A showing that the police deliberately violated one person's rights in order to use his "consent" against another would, however, raise serious questions as to the adequacy of deterrence by suppression only against the former and not the latter.

### 2. Application of Law to Facts

Caro was a conversant in the monitored conversations. Given that the statute requires that one of the conversants consent to surveillance, Caro has standing to challenge the validity of Guevara's consent.

■■■ Guevara agreed to the surveillance and was aware of the presence of the recording equipment both in Memphis and then later in New York. The fact that his consent

to cooperate was the product of a violation of his constitutional rights does not vitiate his consent to the electronic surveillance under the statute with respect to other conversants. His consent to the electronic surveillance was not the product of direct threats to secure his participation in the telephone call, but instead followed from the coerced cooperation agreement. Acknowledging this distinction with respect to Caro's motion does not reduce in any way the seriousness of the coercive tactics deployed to secure Guevara's cooperation, and the need to suppress the products of that cooperation as to Guevara. It does, however, vitiate Caro's objection.

The telephone conversations between Guevara and Caro were properly recorded and are not subject to suppression as to Caro. Recordings of the conversation between Guevara and Caro when they were both present in the hotel room are also admissible against Caro.

Suppression of illegal "fruits" as to the defendant whose rights have been violated does not justify suppression as to codefendants. See Part II.E.1, supra. Suppression as to Guevara will furnish sufficient deterrence against unconstitutional police conduct. Additional suppression of the fruits is not required for deterrence purposes, and would be an unjustified bonanza for someone in Caro's position who was unaware of and not subject to the coercive tactics. The illegalities in Memphis were directed against Guevara primarily and only secondarily and remotely against unknown conspirators. Thus the police are sufficiently deterred by suppression as to Guevara alone.

## C. Restrepo's Motion

Restrepo contends that his interception outside of his house constituted a Terry stop that was unsupported by reasonable articulable suspicion. Alternatively, he argues that if the stop was justified initially, it was soon transformed into a de facto arrest which lacked probable cause.

Restrepo asserts that all the law enforcement officials had to go on initially was Guevara's identification of a house, which had two units, either one of which could have provided access to the basement, rather than a person. The agents had no physical description of the suspect. They had no reason to believe that guns were present since neither Caro nor Guevara were intercepted with, or mentioned, weapons.

### 1. Law

■ Law enforcement officials are justified in detaining someone for an investigative stop where "specific and articulable facts ... taken together with rational inferences from those facts" would " 'warrant a man of reasonable caution' " to believe that wrongdoing was afoot. Terry v. Ohio, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (quoting Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)); see discussion in Part II.C.1, supra. In connection with such a stop, the officials may "tak[e] steps to assure [themselves] that the person with whom [they are] dealing is not armed with a weapon that could unexpectedly and fatally be used against [them]." Id. at 23, 88 S.Ct. at 1881. Terry does not, however, authorize officials to engage in "a generalized 'cursory search for weapons.' " See Ybarra v. Illinois, 444 U.S. 85, 93–94, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979).

■ A protective sweep in connection with a Terry stop made on the sidewalk does not extend to the interior of the suspect's home. To hold otherwise would create a "protective sweep" exception to the warrant requirement for searches of people's homes when they are not apprehended in those homes. Such an exception would be antithetical to the Fourth Amendment since it would greatly expand law enforcement officials' abilities to enter residences to conduct searches on less than probable cause.

That the Supreme Court has carved out such an exception in relation to automobiles, see Michigan v. Long, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201 (1983), in light of the special hazards and needs of roadside encounters, does not require a similar approach with respect to houses. The interest in preserving " 'the sanctity of a man's home and the privacies of life' " is paramount. See Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980). Moreover, a house, unlike a car, cannot be moved while a search warrant is being obtained.

The exceptions to the warrant requirement for residential searches are precisely defined to include: 1) "protective sweeps" incident to a lawful arrest in the home, *see Maryland v. Buie*, 494 U.S. 325, 334, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276 (1990); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *United States v. Hernandez*, 941 F.2d 133, 135–38 (2d Cir.1991); 2) plain view, *see Washington v. Chrisman*, 455 U.S. 1, 5–9, 102 S.Ct. 812, 816–18, 70 L.Ed.2d 778 (1982); 3) consensual searches, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); and 4) "exigent" circumstances, *see Payton*, 445 U.S. at 588–89, 100 S.Ct. at 1381. With respect to a search incident to a valid arrest, a security sweep of the interior of the premises may be permitted where the arrest occurs after the arrestee has exited the premises. *Laaman v. United States*, 973 F.2d 107, 114–15 (2d Cir.1992) (security sweep of premises upheld where arrestees were directed by telephone to exit the premises and complied), *cert. denied*, — U.S. —, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). With respect to the "plain view" exception, the evidence observed in plain view will only be admissible if the law enforcement officials had a proper basis for being where the observation was made. *Chrisman*, 455 U.S. at 5–6, 102 S.Ct. at 816.

"Exigent circumstances refer generally to those situations in which law enforcement officers will be unable or unlikely to effectuate an arrest, search or seizure for which probable cause exists, unless they act swiftly, even though they have not obtained prior judicial authorization." *United States v. Gallo–Roman*, 816 F.2d 76, 79 (2d Cir.1987) (citing *United States v. Campbell*, 581 F.2d 22, 25 (2d Cir.1978)). In determining whether exigent circumstances exist, the district court must consider the following factors:

(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause ... to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a

likelihood that the suspect will escape if not swiftly apprehended;" and (6) the peaceful circumstances of the entry.

*United States v. MacDonald*, 916 F.2d 766, 769–70 (2d Cir.1990) (en banc), *cert. denied*, 498 U.S. 1119, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991); *see also United States v. Brown*, 52 F.3d 415, 421 (2d Cir.1995); *United States v. Medina*, 944 F.2d 60, 68 (2d Cir.1991), *cert. denied*, 503 U.S. 949, 112 S.Ct. 1508, 117 L.Ed.2d 646 (1992). Two additional factors are "a reasonable belief by law enforcement officers that (1) the targets of their investigation are armed; and (2) quick action is necessary to prevent the destruction of evidence." *Brown*, 52 F.3d at 421. These factors are treated as "merely illustrative, not exhaustive, and the presence or absence of any one factor is not conclusive." *Medina*, 944 F.2d at 68. The test for the presence of "exigent circumstances" is " 'an objective one that turns on the district court's examination of the totality of the circumstances confronting the law enforcement agents.' " *United States v. Gordils*, 982 F.2d 64, 69 (2d Cir. 1992) (quoting *MacDonald*, 916 F.2d at 769), *cert. denied*, — U.S. —, 113 S.Ct. 1953, 123 L.Ed.2d 657 (1993).

The United States Supreme Court has found that exigent circumstance exist where the police are in hot pursuit of a suspect who enters a private dwelling, *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), where there is the potential for serious danger to the public, *see, e.g., Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (burning fire), or where there is reason to believe that evidence will be disposed of before it can be collected, *see, e.g., Schmerber v. California*, 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966) (evidence of blood alcohol content).

The situations in which the presence of "exigent circumstances" will justify entry into a home without a warrant or consent must be serious and require immediate entry in the public interest. In two of the leading cases in this circuit, law enforcement officials

were aware of the presence of guns in the apartment because of first-hand accounts from those who had been in the apartment. *See, e.g., Gordils* (confidential DEA informer observed drugs and was told by occupants that guns were present); *MacDonald* (agent attempting an undercover purchase of narcotics observed drugs in the apartment and firearms being held or within easy reach of the defendants).

In *United States v. Gallo–Roman*, 816 F.2d 76, 79–80 (2d Cir.1987), DEA agents entered an apartment to which they had followed a suspect. The suspect had picked up an envelope at a post office which, unbeknownst to her, had previously been intercepted by agents. The agents had removed the cocaine it originally contained and substituted for it a cocaine and dextrose mixture. At the apartment, the agents heard the toilet flushing and observed Gallo–Roman standing over a toilet bowl on which sat the packet from the envelope. The court found that exigent circumstances justified the warrantless search of the apartment on the grounds that the agents were motivated by more than mere speculation and that they "reasonably could have expected the evidence seized to be destroyed before they could obtain a warrant." *Id.* at 79. It implicitly found that the agents had probable cause to enter the apartment, *id.*, which, coupled with the easy disposability of the evidence known to be in it, justified the warrantless entry and search.

### 2. Application of Law to Facts

█ Guevara's pointing out the housing unit containing Restrepo's residence created a reasonable articulable suspicion that criminal activity had been or would be committed at that location. Guevara had been helpful and cooperative to that point, a fact properly considered despite the coercive pressures under which he was operating. The agents were entitled to rely on his identification of the housing unit, even though he could not be sure which individual residence was the one they sought. Consequently, when they observed Restrepo on his outside landing, the agents were justified in detaining him to the extent necessary to resolve their suspicions.

█ The intrusion into Restrepo's house, however, can neither be supported as a protective sweep nor as a search. Protective sweeps are confined to the scope necessary to protect law enforcement officials from harm or injury. The assertion that the sweep was for "protective purposes" is belied by the fact that Restrepo himself was not subject to a "pat down" of the type permitted under *Terry* before the sweep commenced. Invasion of Restrepo's home was not justified under the circumstances where there was no overt indication of the presence of weapons or guns and less intrusive measures for self-preservation were available (for example, moving Restrepo somewhat farther away from the house for questioning while maintaining surveillance of the house).

Of course, where there are drugs guns may not be far behind. *Cf. United States v. MacDonald*, 916 F.2d 766, 770 (2d Cir.1990) ("[T]he volatile mix of drug sales, loaded weapons and likely drug abuse presented a clear and immediate danger to law enforcement agents and the public at large."). In this case, however, an official's belief that drugs were in the house or connected to Restrepo was speculative at best. The potential for weaponry, therefore, was not sufficiently concrete to support the intrusion.

The exceptions to the search warrant requirement do not apply. This was not a search incident to an arrest since Restrepo was not under arrest at the time the "sweep" was conducted. The officials were not in "hot pursuit" of a suspect since Restrepo had not been identified as a suspect at that time, and in any event, no one was attempting to flee when the sweep was conducted.

█ Nor do the facts support the government's contention that "exigent circumstances" justified the intrusion into Restrepo's home without a warrant. The law enforcement officials had already detained Restrepo on the sidewalk at the time the sweep was commenced; thus, this was not the typical "exigency" in which the officials enter a house to pursue a defendant whom they have probable cause to believe committed a crime, or whom they believe will destroy evidence. This was not a situation, as in *Gallo–Roman*, where the officials followed a suspect known to possess an envelope containing evidence which could easily be disposed of into an

apartment. Nor was it a situation, as in *Gordils* and *MacDonald*, where the officials had the benefit of first-hand observations of weapons and drugs in the residence. Restrepo had already been "neutralized" outside of his home.

Nor could the law enforcement officials' speculative belief in the presence of other suspects armed with weapons or posed to dispose of evidence constitute an exigency justifying an intrusion. The officials' belief in the presence of additional coconspirators, weapons, and additional evidence would have been mere conjecture. Even if the officials, based on the shadows observed through the window, had a reasonable belief that someone else was in the house, they lacked probable cause to believe that any of the house's occupants—including Restrepo—had committed a crime. There was no basis for believing that the "targets of their investigation" were armed, beyond the general observation that weapons and drugs often go together. Any evidence subject to disposal—the cocaine—was already safely in the officials' possession; no one has asserted that the officials relied on, or could have relied on, as an exigency the prospect of large amounts of cash (the other side of the drug transaction) being burned or otherwise destroyed, especially where there were no signs that such destruction of evidence was taking place.

Since the officials lacked a proper basis for their entry into Restrepo's house, the evidence seized there, including the license plates, must be suppressed as the fruits of an illegal search. The license plates, known to the officials to be an extra set since Restrepo's car parked in front of the house possessed its own plates, linked Restrepo to Caro because of Caro's statement that he would supply Guevara with a set of local plates. The plates are not admissible against Restrepo under the plain view doctrine since the officials observed them from a place they had no right to be—inside the house.

Because the only evidence supporting probable cause for Restrepo's arrest and for the later obtained search warrant was that obtained during and as a result of the illegal household "sweep," his arrest and the search warrant were invalid. There is no basis in fact for an argument that the license plates,

the money, the photograph of Caro or the beeper would have been inevitably discovered since there was no basis for his arrest or for a warrant to search his house absent the illegal entry.

There is no showing that Caro had any standing to protest the illegal entry into Restrepo's house. The evidence suppressed as to Restrepo is admissible against Caro.

## IV. CONCLUSION

Defendant Guevara's and defendant Restrepo's motions to suppress are granted. Defendant Caro's motion is denied.

SO ORDERED.